## LYNCH, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

### St. Louis Court of Appeals, November 17, 1903.

1. **Carriers of Passengers:** LANDING PASSENGERS: RUNNING PAST CROSSING. A street railway company is bound, in discharging passengers from its cars, to select a safe landing place; and if it does so, it is not liable for injuries to a passenger incurred in alighting from the car, although the car has run past the street crossing at which it was signaled by the passenger to stop.

2. ———: ———: ———: PROXIMATE CAUSE OF INJURY. Where a passenger is discharged from a street car at a safe place, but incurs injury in stepping off, the incident must be classed as a pure accident and the running past the crossing can not be assigned as the proximate cause of the injury.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

REVERSED.

*Boyle, Priest & Lehmann, Morton Jourdan* and *George W. Easley* for appellant.

(1) The demurrer to the evidence should have been sustained. The evidence nowhere shows that the pretended dangerous place was made so by any act of defendant, or that the defendant was charged with any duty of keeping the street in good condition for passen-

gers going to or from the cars. In the absence of such proof the plaintiff can not recover. Moss v. Railroad, 57 App. Div. (N. Y.) '587, 11 Am. Neg. Rep. 568. (2) It not being shown that the defendant had any control over the street, and was under any duty to keep the same in repair, it is not liable for the condition of the street. Conway v. Railroad, 87 Me. 283, 3 Am. Neg. Cas. 605. Lee v. Railroad (Mass. 1903), 13 Am. Neg. Rep. 319; Bigelow v. Railroad, 161 Mass. 393, 37 N. E. 368. (3) The alleged negligence of the defendant, in running past the point where the plaintiff alleges the car should have been stopped, was not the proximate cause of the accident. Conley v. Express Co., 87 Me. '352, 32 Atl. 965; Conway v. Railroad, 87 Me. 283, 38 Atl. 112; Sweeney v. Railroad, 153 Mo. 383.

*Joseph A. Wright* for respondent.

(1) A passenger in alighting from the car may assume that the carrier (whether steam or street railway) in the exercise of a high degree of care, has furnished a safe landing place. If the passenger thus relying upon the carrier and in consequence thereof and in the exercise of ordinary care sustains injury, the carrier is liable. McGee v. Railroad, 92 Mo. 208; Griffith v. Railroad, 98 Mo. 168; Cobb v. Railroad, 149 Mo. 136; Talbot v. Railroad, 72 Mo. App. 291; Atkinson v. Railroad, 90 Mo. App. 489; Warden v. Railroad, 35 Mo. App. 631; Bass v. Railroad, 70 N. H. 170; Joslyn v. Railroad, 67 N. E. (Mass. 1903)866; Railroad v. Scott, 86 Va. 902;Poole v. Railroad, 100 Mich. 379, 25 L. R. A. 744; The Pennsylvania Co. v. McCaffrey, 173 Ill. 169; Vasele v. Railroad, 16 Wash. 602; Nellis on Street Surface Railroads, 485. (2) The interruption of defendant's counsel in his argument to the jury by one of their number, under the facts shown in defendant's bill of exceptions, does not constitute reversible error. Hamburger v. Rinkel, 164 Mo. 398; State v. Robinson, 117 Mo. 649; State v.

Taylor, 134 Mo. 109; State v. Baber, 74 Mo. 292; Railroad v. Holland, 122 Ill. 461; Nye, etc., Co. v. Snyder, 56 Neb. 754; 17 Am. and Eng. Ency. of Law (2 Ed.), 1204, 1206, 1250.

### STATEMENT.

The important portions of the testimony are subjoined.

Plaintiff testified as follows:

"Q. Did you ask the conductor to back the car up to the crossing? A. Why, I had no idea of such a thing. There was no danger. I didn't ask him because I didn't see any danger in getting off there.

"Q. You didn't see any danger in stepping from the car where you were? A. No, sir; it seemed to me that I was stepping as I would an ordinary step.

"Q. It looked to you a perfectly safe place? A. It looked to me safe; yes, sir.

"Q. Or you wouldn't have stepped? A. I wouldn't have stepped. . . .

"Q. Now, Miss Lynch, you walked out upon the rear platform, saw the place at which the car had stopped, stepped from the car without asking the conductor or requiring of the conductor that he move the car back to the crossing or carry you to the crossing west didn't you? A. I saw no necessity, because I saw no danger in getting off there.

"Q. Please answer my question: You did not make any such request of the conductor? A. No, sir.

"Q. You said not a word to the conductor? A. No, sir.

"Q. You had seen a lady get off there ahead of you in safety, hadn't you? A. I hadn't seen her get off.

"Q. Well, you stepped from the car; from the bottom step? A. I don't know how many steps there were, but I stepped from the bottom.

"Q. Now, in stepping from the bottom step of the car did you step up or did you step down. A. I stepped up.

"Q. Then the ground upon which you stepped was higher than the lower step of the car? A. The ground was sloping up from the place.

"Q. It was higher, wasn't it? The ground was higher than the lower step of the car? A. It didn't seem to be very much higher, it was sloping up.

"Q. Now, that being true, your stepping up from the lower step of the car, the ground must have been higher than the lower step, wasn't it? A. Yes, sir.

"Q. When you stepped off there, which foot did you put forward? A. My left foot. . . .

"Q. And then you followed it with the right? A. Yes, sir. . . . .

"Q. And you stood there until the car moved away? A. Yes, sir. . . .

"Q. And your sister stepped off behind you, did she? A. Yes, sir.

"Q. And from the same place in the car? A. Yes, sir.

"Q. And she stepped to the ground, did she? A. Stepped as I stepped; I guess; I don't know how she stepped.

"Q. And she was not injured? A. No, sir.

"Q. And the ground there was of the same general formation, wasn't it—I mean at the platform? A. Well, I suppose so. She didn't step just where I did, because I was there, you know, she stepped to one side.

"Q. No, she stepped either to your right or to your left? A. Yes, sir.

"Q. And I say the ground there is of the same general formation? A. I guess it is. It mightn't be.

"Q. Well, you saw it, didn't you? A. When?

"Q. That day you stepped? A. That day I saw where I was stepping, but I wasn't examining the rest though.

"Q. Did you or did you not say anything to the conductor? A. I did not.

"Q. About having stopped the car at that place? A. I did not.

"Q. Either before or after you alighted? A. No, sir.

"Q. And when the car moved away your sister assisted you? You felt that you had a pain in your ankle, was it? A. No, sir.

"Q. Where was it, in the limb? A. In the limb and above the ankle—between the knee and the ankle.

"Q. You felt that pain and your sister assisted you getting up the rest of the terrace? A. Yes, sir.

"Q. Is there much of a terrace there in addition to that? A. No, I say it may be a little higher than this (indicating). I don't know just exactly what it is, but she had to just take hold of me.

"Q. You are assuming that this is the bottom or the rail? A. No, from the floor I should think, slants up from that point; and of course, you understand, in this slanting it may appear to be higher than in a straight line.

"Q. Now, assuming that this is the track (indicating)? A. Yes, sir.

"Q. The ground slanted in *that* direction, did it? A. Yes.

"Q. And it came to a place about *this* high from the track? A. I should think it was pretty near that.

"Q. You don't mean that you stepped to this point? A. No, sir, I took what would be a natural step and then I stepped right out, and then my sister had to take me up the rest of the way to the top of this. . . .

"Q. Well, did you step clear to the top of this terrace? A. No, sir, I made one step—now it would seem to me that my sister dragged me up two or three steps before I got to the top.

"Q. Well, then, that would be about six feet to get

to the top, would it? If you stepped two feet at a step, you would have to step six feet to get to the top; or four or six feet you say, she dragged you up? A. I don't know; I couldn't tell you that.

"'Q. Did your left foot slip when you put it on the ground, when you alighted from that car? A. No, sir; the minute my foot touched the ground I felt this strange feeling right through my limb.

"Q. Did you jump when you got off the car, jump forward on your left foot in any way? A. No, I stepped just a natural step stepping out of the car.

"Q. And you saw where you were stepping? A. I thought I saw where I was stepping.

"Q. You were looking down? A. I was looking at the place I was going to get out, just as I look always when I am stepping out of a car. I looked just in the same way of course, that we step out of a car generally; we step right down onto the street, if the step is higher than the paved street.

"Q. This time, I understand, you stepped up a little? A. Yes, sir, I had to take a step up.

"Q. Did you take hold of the hand-rail as you got off, do you remember? A. I couldn't tell you that, but I think so. Probably I did so; but as I say about that, I couldn't be positive. I generally make a practice of doing so.

"Q. But you say you just took one step with your left foot and you felt this pain immediately? A. Immediately that my foot touched—

"Q. That your foot touched the ground? A. As soon as I got my foot there.''

Julia F. Lynch gave this testimony:

"Q. Now, when you walked out to the rear platform your sister was in advance of you? A. Just in advance.

"Q. She turned and walked down the steps and stepped off? A. Yes, sir.

"Q.   You immediately stepped off the car too?   A. To the side of her.

"Q.   From the same step she had taken? A.   Yes.

"Q.   And stepped immediately to her side?   A. Yes, sir.

"Q.   Was the ground   slanting   there   also?   A. Slanting, yes.

"Q.   And you were not injured?   A.   No, I was not injured.

"Q.   And as a matter of fact, you are a little bit heavier than your sister, aren't you?   A.   I think we were about the same then.   . . .

"Q.   Neither of you complained to the conductor that he had passed over the crossing or as to the condition of the ground and neither of you asked him to back the car back to the crossing or carry you on to the next crossing, that you might alight on the crossing? A.   Well, we saw no danger in getting off.

"Q.   Well, I didn't ask you that.   You didn't do that, did you?   A.   No.

"Q.   You walked out there upon the platform, as was your custom and down the steps, looked where you were to step and you stepped off in perfect safety?   A. Not in perfect safety, my sister didn't.

"Q.   Well, you stepped off in perfect safety, didn't you?   A.   I did, yes.

"Q.   And you assisted in getting her up the terrace?   A.   Yes, sir.

"Q.   She walked with your assistance over to the Cullens?   A.   She managed to get there with my assistance.

"Q.   And she remained there until about eight o'clock in the evening?   A.   Yes, sir.

"Q.   And the accident occurred about twelve or a little before?   A.   Yes, we were trying to restore her, see what we could do for her pain all that time.

"Q.   I didn't ask you a word about that.   I say the accident occurred about twelve or a little before that in

the daytime? A. About that time, just a little before twelve.''

Michael R. Cullen, who lived near the locality, testified:

''Q. Describe to the jury the lay of that ground as it was on the 20th day of last April at a point fifteen or twenty feet west of the crossing? A. Well, it looked at that time on the north track that the rails were put in an intrenchment and left an embankment—

''Defendant objects as incompetent.

''Mr. Wright. Describe it as it appeared to you on that day?

''The Court: Not the track, but the ground on the north side of the track.

''A. It looked as if though there was an embankment left there—

''Defendant objects that witness should state the condition as he saw it.

''The Court: Just state as you saw it.

''Mr. Wright: How did it appear to you? A. How did it appear to me?

''Q. Yes, was there a slope up from the track or not? A. There was a slope up from the track.

''Q. How much slope? About how much? A. Well, of course, as to measurement, I couldn't be very accurate about that; but after you were about a foot and a half from the track there is an elevation, at that time there was an elevation going up about—well, I should say a foot and a half, it looked to me, and then along a rough terrace of ground and then another elevation all along there.

''The Court: Well, was there a wagon road on the north side of the track? A. Not a wagon road.

''Q. Couldn't teams drive through there? A. They could.

''Q. And how wide was this first elevation you spoke of? You say there was a sort of terrace about a

foot and a half high? A. It appeared to be that. It might not be quite that much.

"Q. From where? From the track? A. Not from the track. It didn't begin at the track. It was off a distance of probably fourteen or eighteen inches from the track.

"Q. Was the ground level off from the track about eighteen inches? A. The ground was level for about eighteen inches.

"Q. Then the slope began? A. Then the slope began.

"Q. For about how far? A. Well, I should judge for about eighteen inches.

"Q. Then it was level again, was it? A. Level probably six inches.

"Q. Sort of a step then? A. Exactly like a step. Then there would be a little mound beyond that again.

"Q. What do you mean by a little mound? A. As if clay was thrown up on top of it.

"Q. Was it like a terrace? A. Something on that order."

Mary Cullen said:

"Q. Just describe that crossing there? A. Directly west of the street where we generally get off there seems to be—I would call it a slight hill, an elevation, or an embankment, rather rough and uneven on the surface and sloping side. It begins to slope very close to the car tracks on the north."

James H. McNamara said:

"Q. Do you know about the height of the car steps above the track—the cars that run along there? A. They are about eighteen inches above the track, and the edge of the step is about eighteen inches over the track—fourteen to eighteen.

"Q. Well, now, what I want to ask you is this: Suppose a person steps off that car and takes a step of about two feet, say, puts his foot on the ground, would the ground that he put his foot on be on the same level

as the step, say at a point fifteen feet from the crossing?
A. Why, a person stepping off the car-step on to the
ground would step almost straight out, because the
ground rises to catch their step.

"Q. Then where he puts his foot would be just
about on a level with the step? A. About on a level
with the step—about eighteen inches above the track.

"Q. You just said that the step, I believe, was
eighteen inches above the track? A. Yes, sir.

"Q. Now, take it twenty feet west, how would it be;
there it would be a little lower, as I understand, accord-
ing to your testimony? A. At twenty feet the step
would be shorter a person would have to take to reach
the bank, because the bank is steeper and hence nearer
to the step; the lower the ground is, the further you have
to step from the track—from the step of the car down.

"Q. Well, would a person stepping off from a car
a step of about two feet, would his foot be placed on
ground that was lower than the step, or on ground that
was higher than the step? A. No; it would be placed
on ground that was higher, because it is inclined all the
way from the car track up the bank and no matter where
you step on the bank you would be stepping on the same
incline."

Plaintiff got a verdict and the defendant appealed.

GOODE, J. (after stating the facts as above.)—
The plaintiff was hurt in stepping from one of the de-
fendant's trolley cars, Sunday, April 20, 1902. Plain-
tiff and her sister, Miss Julia F. Lynch, had attended
church that morning and afterwards had taken passage
on a west-bound Cass avenue car to be carried to Euclid
avenue. They signaled by ringing the bell before
reaching the place where they wished to get off, which
was the west crossing of the intersection of St. Louis
and Euclid avenues. But instead of the car stopping
at the crossing as usual, it moved past it and stopped so
that the rear platform was about fifteen feet further

west.  After it had stopped, plaintiff's sister and another lady passenger got off safely, but when plaintiff stepped off she was instantly seized with a severe pain in her left leg, which transfixed her for a few moments on the spot where she stepped and caused her to suffer for several weeks.  The evidence as to what her injury was is indefinite; but we gather that she wrenched or sprained the muscles of her leg between the ankle and the knee.

The charges of negligence against the Transit Company are that the car crew failed to heed plaintiff's signal to stop at the crossing on the west side of Euclid avenue, and instead, ran past the crossing and stopped the car at a place where they knew it was dangerous to alight.  The place is averred to have been a bank of earth which subjected plaintiff to a great effort and strain in stepping from the platform of the car to the ground; but all the evidence went to disprove that averment.  It is difficult to describe the spot so as to convey an accurate impression and we must refer to the testimony which accompanies this opinion, from which the reader is likely to form an approximately true image.  Some photographs were introduced in evidence which exactly portray to the eye the configuration of the ground.  The street was unmade there and a low embankment of easy grade extended from the railway track to a level some six or seven feet away.  The embankment is spoken of by the witnesses as a terrace; but it was no terrace in the proper sense of the word.  At the point where the plaintiff got off there was a sort of rough shelf or step formed in the side of the slope, and a person stepping from the car-step would naturally and easily put his foot down on a nearly horizontal but not entirely smooth surface.  The plaintiff and her sister, both of whom testified with praiseworthy candor, said the spot looked to them to be perfectly safe.

The omission of the carmen to stop the car at the crossing was not the proximate cause of the injury to

the plaintiff; because, while maybe the accident would not have happened if that had been done, passengers are constantly let off cars at other places than street crossings without harmful consequences. Most other portions of streets are as safe to alight on as crossings, and varieties of cars are constantly used that permit passengers to board and alight anywhere along one side of a car; which, of course, contemplates their doing so away from crossings. There is an ordinance of the city of St. Louis requiring cars to stop at crossings for the convenience of the public in getting on and off, but this ordinance was not counted on or put in evidence; and if it had been, we apprehend the question of plaintiff's responsibility would still turn on whether the place where the car stopped was a safe one for alighting. What a street railway company, or other carrier is bound by law to do in discharging passengers from a vehicle, is to use high care to select a safe landing place, and in other ways to endeavor to land them safely.

The pivot of the case is whether there was evidence from which the injury could rightly deduce the inference that the place where plaintiff was discharged was unsafe; or that defendant ought to have forseen there was danger of an accident if she was discharged there. She was willing to get off at that point and waived the inconvenience incident to being carried past the crossing. The spot where she stepped to the ground appears to have been as safe as the crossing itself, or safer; for, instead of a downward step, she had to take a horizontal one. The time was just after noon, when every feature of the ground was visible. One may slip or wrench a muscle by stepping on a slightly uneven surface, small pebble, or other body in the street at any point; but the occurrence of such an accident does not necessarily authorize the inference of negligence on the part of any one. Henry v. Ry. Co., 113 Mo. 525; Ward v. Andrews, 3 Mo. App. 275. And the particular accident under in-

vestigation presents no characteristics which bespeak either that the defendant was negligent in selecting a landing place for the plaintiff, or even that the place selected was unfit. The occurrence rather falls in the category of pure accidents for which, as human ken can not embrace them, nobody is to blame. Blame for an accident attaches only when it was one to be foreseen and averted by the exercise of the degree or quantum of care which the law exacted of the parties concerned in the situation and relationship they were in at the time. Fuchs v. St. Louis, 167 Mo. 620; Sullivan v. Ry. Co., 133 Mo. 1; Bowen v. Ry. Co., 95 Mo. 268; Waller v. Ry. Co., 59 Mo. App. 410; Banks v. Ry. Co., 40 Mo. App. 458.

In this case the law imposed upon the car crew the duty of exercising that high vigilance to prevent injury to the plaintiff which very cautious railway men are wont to exercise. If the place chosen for the plaintiff to land was safe, the carmen fully performed their duty, high though it was. As indicated, the fact that plaintiff got hurt as she did does not by itself justify the conclusion that the place was unsafe. The injury was a singular one and is really unaccounted for by the evidence. If due to the unevenness of the ground where she stepped, the risk was of a trifling character and no greater than is constantly encountered with impunity by multitudes of men every day. In some way she sprained her foot or leg severely as she stepped from the car; but there was nothing about the place where she alighted which suggested to her or any one with her who saw it, that an injury was likely to happen in getting off there. She testified she saw no danger; that she took an easy, natural step, nearly straight out from the lowest step of the car and that the instant she put her foot on the ground a violent pain struck her. Her sister testified the same way concerning the apparent safety of the place; and all the testimony shows there was no risk, or even the least difficulty in getting off the car there.

The accident thus plainly presents itself as the result of pure chance into which no blamable human agency entered as an active cause. The defendant can not be held answerable from the fact that plaintiff got hurt in leaving its car while the car was standing at a safe place, although that place was a short distance from the one where passengers usually alighted. There was no tie of causation between the plaintiff's injury and any negligence of defendant, no negligence of the defendant being shown. The defendant, or any other carrier, should not be the least remiss in the choice of landing places and can not lawfully be. It must choose them with great care; and where there is an embankment or other surface fault which enhances the peril of alighting, the place is an improper one to discharge a passenger. But a careful study of the evidence in the present case discloses nothing tending to prove that the bank of dirt on which plaintiff stepped presented any perceivable difficulty or hazard.

The facts before us are like those in Conway v. Lewistown, etc., Ry. Co., 90 Maine 199, which was to recover damages for a broken ankle, the injury having been caused by stepping on a loose stone in getting off a street car. In that case, as in this one, the assignments of negligence against the defendant were running the car past the crossing and stopping it at an unsafe place. That plaintiff complained in her testimony of a slight ditch or depression in the ground where she got off; but the excavation was not dangerous, nor the step she had to take in leaving the car long or difficult. The opinion said, assuming her description of the place to be accurate, that there was a failure to establish liability on the part of the defendant; since neglecting to stop the car precisely at the crossing was not culpable, nor was the place of alighting so difficult and unsuitable as to render it actionable negligence to permit a vigorous young woman to get off there; further, that her injury was not the probable or ordinary result of stopping

at that particular point, but was due to an event which could not have been anticipated.

As we find no evidence which has a tendency to prove the defendant's servants were guilty of any negligent act in their conduct toward the plaintiff, the judgment is reversed. *Bland, P. J.*, and *Reyburn, J.*, concur.