934

ANNIE R. CALEY, RESPONDENT, v. KANSAS CITY, MISSOURI & KANSAS CITY PUBLIC SERVICE CO., APPELLANTS.—48 S. W. (2d) 25.

Kansas City Court of Appeals.    February 1, 1932.

*Benj. W. Grover* for respondent.

*George Kingsley* and *Marcy K. Brown, Jr.*, for City.

*Watson, Gage, Ess, Groner & Barnett* for appellant, City Public Service Company.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $3500, and defendants have appealed.

The facts show that on May 12, 1928, while plaintiff was going to her work in the down town portion of Kansas City, she was injured by stepping in a hole when alighting from a street car. The car was being operated by the defendant, Kansas City Public Service Company (hereinafter called the street car company). The street car in question was headed south on McGee street. The car was stopped by the operator thereof on the north side of 11th street, a street intersecting McGee street, for the purpose of allowing passengers to alight.

The car in question was what is known as a "one man" car. The front platform was divided in the middle with an upright iron rod called, in the testimony a "stanchion." The passageway between the stanchion and the front end of the vestibule of the car was for persons boarding the car and the space between the stanchion and the body of the car was for those alighting. The vestibule was enclosed by folding doors. When persons desired to alight the operator of the car would open the doors and the passengers would step down to the step and thence to the ground. The step was normally twelve to sixteen inches above the ground, that is if there was no hole in the ground surface below the step.

When the car stopped plaintiff arose from her seat and went to the front platform and found the doors closed. She stood between the stanchion and the body of the car until the operator opened the doors. She then looked out to see if any automobile was in the vicinity that might interfere with her alighting and, finding none, she stepped her right foot down on the step of the car with her face toward the west or in the direction in which she was alighting, with her hand upon the stanchion. Before stepping her left foot to the ground she looked down. With reference to the matter of looking, she testified: "I looked before I step always, just like you would or anyone would look where they were stepping." She testified that she did not see any hole; that the surface of the street appeared not to have any holes in it, so she placed her left foot upon the ground. Her ankle turned and she fell prone upon the street, resulting in a severe sprain to her ankle. When she was assisted to her feet she noticed there was a large hole in the pavement immediately in front of the car step. The evidence shows that this hole was about three feet wide, five feet long and four to six inches in depth.

The street was paved with asphalt but an excavation had been made by the Gas Company which had either not been entirely filled up or the loose rock with which it had been filled had been partially thrown out by the wheels of motor vehicles, leaving the hole in question. Plaintiff stepped on the edge of the hole near the car tracks. She testified that when she stepped, "It just sunk down;" that she "got on the edge of that and I went down with it." There is no evidence as to the location of the east edge of the hole with respect to the nearest car track, but a photograph introduced in evidence by plaintiff, which was taken four days after she was injured, indicates that the edge of the hole where she stepped was very near thereto. Plaintiff testified that the motorman stopped the car "right over the hole where I stepped off." It was admitted that the overhang of the car was from eighteen to twenty inches.

The evidence shows that the hole had been there for at least two months. The motorman, who testified for the street car company, stated that he saw the hole a month prior to the time plaintiff fell but that at that time he stopped the car a few feet further south than he did at the time in question.

We will first take up the assignments of error made by the street car company.

It is insisted that the court erred in refusing to give the instruction of the street car company in the nature of a demurrer to the evidence. In this connection it is claimed that it was not responsible for the condition of the street, having no control thereof, and that the defect in the street was of such an ordinary and trivial nature as not to render it negligent in having stopped the car there.

While it is true that the street car company had no control over the street and there was no duty upon its part to repair the same and, in this respect, there is a difference between the duty of a street car company and that of a railroad company, which furnishes places for the discharge of its passengers, yet, a street car company is under the duty to exercise the highest degree of care in selecting a reasonably safe place for the discharge of its passengers. In other words, it must exercise that care in ascertaining whether or not the place it discharges its passengers is reasonably safe. [Fillingham v. St. Louis Transit Co., 102 Mo. App. 573; McDonald v. St. Louis Transit Co., 108 Mo. App. 374; Sweet v. Louisville Ry. Co., 113 Ky. 15; Stewart v. St. P. City Ry. Co., 78 Minn. 85; Richmond City Ry. Co. v. Scott, 86 Va. 902; Slocum v. Peoria Ry. Co., 179 Ill. App. 317; 10 C. J., pp. 915, 916; Melton v. 'Birmingham Ry., etc. (and note), 16 L. R. A. (N. S.) 467.]

The street car company seems to think that it has discharged its full duty unless it stops its car so that passengers must alight in a

"situation bristling with glaring and obvious possibilities of harm" to the passengers; that the defect must be a "glaring or manifestly dangerous one, such as an open excavation."

We are unable to agree with this contention of the street car company. The rule is that if the defect in the street is such a dangerous one as likely to result in injury to a passenger in alighting and the passenger is injured while so alighting, as was plaintiff in the case at bar, the street car company is liable. The duty of the company is to stop its car at a point beyond or short of the defect in the street or to warn the passenger of its presence unless its presence is glaringly obvious. [See cases last cited.] There is no rule found in the authorities requiring that the defect or danger must be glaring in order to render the carrier liable. In the case of Sweet v. Ry. Co., supra, it was held that a depression two or three feet in length and six inches deep at the edge of defendant's track, in a macadam road, and so near the track that one stepping from the car would be likely to step into the depression is not a reasonably safe place to discharge passengers.

In the case of Carroll v. N. O. Ry. & Light Co., 61 So. 752, cited by the street car company, plaintiff's husband caused the conductor of the car to permit her to alight just before the car reached the regular stopping place, which was safe. She was not hurt in alighting but by stepping into a depression while walking away from the car. It was held that she should have waited until the car arrived at the regular stopping place. The street was unpaved, "in which ruts, holes, and depressions might be expected in the winter season." In the Carroll case the street was not paved, and the other facts were entirely dissimilar.

In Lynch v. St. Louis Transit Co., 102 Mo. App. 630, the car was stopped where the street was unmade, which must have been plain to all. There was a low embankment of easy grade extending from the railway track to a level some six or seven feet away. At the point where plaintiff got off the car there was a sort of rough shelf or step formed in the side of the slope, and a person stepping from the car-step would naturally put his foot down on a nearly horizontal but not entirely smooth surface. The evidence was that the spot where plaintiff stepped looked "to be perfectly safe." At page 643 of the opinion the court said: "A careful study of the evidence in the present case discloses nothing tending to prove that the bank of dirt on which plaintiff stepped presented any perceivable difficulty or hazard." At page 642 the court said: "The risk was of a trifling character and no greater than is constantly encountered with impunity by multitudes of men every day." At page 641 the court said: "One may slip or wrench a muscle by stepping on a slightly

uneven surface, small pebble, or other body in the street at any point; but the occurrence of such an accident does not necessarily authorize the inference of negligence on the part of any one.'' The Lynch case is wholly unlike the case at bar.

The street car company insists that plaintiff's photograph shows that the place selected for plaintiff to alight was reasonably safe. But we cannot so say, as a matter of law, even from an examination of the photograph submitted to us. Aside from this, it may be inferred from the evidence that the hole was partially filled up with chat or small crushed rock between the time plaintiff fell and the time the photograph was taken. Plaintiff's photographer who measured the hole when he took the picture stated that the hole was from four to five inches in depth. The street car company insists that plaintiff is bound by what the photograph shows for the reason that she introduced it in evidence and that the testimony of all of her· witnesses that it was as much as six inches deep does not conflict with that of the photographer and, therefore, that it was not filled up any between the time plaintiff fell and the time the picture was taken.

Assuming that the testimony of the man who measured the hole must be taken as showing its depth at the time the photograph was taken, the jury was not required to find that it had not been partially filled up. This, for the reason that there was other testimony that at the time plaintiff fell, it was as much as six inches deep. The jury could have believed this testimony as well as that of the photographer who measured the hole and found it ''four or five'' inches deep. There is nothing inconsistent in the jury's finding, if any, that the hole had been filled and that the photographer told the truth.

However, plaintiff, herself, and some of her witnesses, testified, upon being shown the photograph at the trial, that it appeared to show a hole much shallower than the one which was there when plaintiff fell and, from this testimony alone, the jury was justified in finding that there had been a change in the depth of the hole between the two times. Between the time that plaintiff fell and the taking of the photograph the hole may have been completely filled and the chat forced out, in part, by automobile travel. However, we do not think that this matter, made so much of by the street car company, is of great importance, for the reason that even if the hole were only five inches deep at the time plaintiff fell, it was a dangerous place. At least, the jury could so find. The photograph which is before us shows very little in reference to the depth of the hole. Of course, it is well known that photographs do not always indicate the exact depth of a depression or a hole. We are not experts in the art of photography and do not know why this is so. It may be

caused by the manner in which the light is reflected in holes or depressions below the surface of the ground. The whole matter was for the consideration of the jury. [Clardy v. K. C. P. S. Co., 42 S. W. (2d) 370.]

There was ample testimony tending to show that the street car company violated its obligation to use the highest degree of care in not observing and ascertaining the presence of the hole or depression in the street. We are not obliged to go to the extent of saying that a street car company is under the absolute duty, where it does not own or control the street or landing place, of knowing the condition of the street where it stops its cars for the purpose of discharging passengers and, do not pass upon that question, but if it is not under that duty its obligation comes very nearly equaling it.

The evidence in the instant case shows that the very motorman in charge of the car upon which plaintiff was a passenger saw this hole in the street a month prior to the time plaintiff was injured. The street car company contends that what he saw was another hole, but the jury could construe his testimony to mean that it was the same hole. Aside from this there was evidence that the hole had existed for at least two months, which was ample time for the street car company to have known of it by the exercise of merely ordinary care and, even if the hole had come into existence only a short time before plaintiff was injured, the jury could say that the motorman in charge of the car, by the exercise of the highest degree of care, could have observed it as the front end of his car passed by it on the morning plaintiff was injured. We think there is no question that there was ample evidence as to the negligence of the street car company.

It is insisted that plaintiff was guilty of contributory negligence, as a matter of law. In this connection it is insisted that the hole or depression was plainly to be seen and plaintiff's testimony that she did not see it is contrary to the physical facts and the court should disregard it.

The evidence shows that plaintiff was injured about 8:30 on a clear bright morning. While the place where plaintiff alighted was more or less congested with automobile traffic, she had looked for moving automobiles and had seen none near at hand before she stepped to the step of the car. As was her usual custom she looked to the ground before she stepped and she testified and the record otherwise shows, that there was nothing to distract her attention in so looking. The pavement was dry and other passengers testified that they saw the hole before alighting.

The evidence in reference to the other passengers shows that one, Miss McDowell, who was a witness for plaintiff, was a passenger

upon the car and alighted at the time plaintiff did. Miss McDowell was about one step to the rear of plaintiff and alighted from the car south of the stanchion or where passengers ordinarily boarded the car. Miss McDowell testified that she alighted at this place a number of times; that at all times she had alighted safely; that sometimes she had seen the hole and other times she had not observed it when alighting. She testified that the first thing that caused her to pay attention to plaintiff was when the latter fell; that at that time she was upon the step "just a step behind" plaintiff; that at the time of the accident: "You could see there was a hole there, yes. Q. And it was very plain if you would look at it, wasn't it? A. Why, yes, the hole was there, anyone could see it. Q. You couldn't miss seeing it if you looked at it could you? A. No."

Another of plaintiff's witnesses, Miss Raney, who was alighting from the car behind plaintiff, testified that after plaintiff fell she observed a "big hole there  .  .  .  about four or five inches deep;" that the witness stepped into the hole after plaintiff fell without any untoward occurrence; that this was because she "already knew there was a big hole there because I seen it.  .  .  .  Because I seen her fall and saw it." Q. It was perfectly visible from the platform of the car where you were standing, wasn't it? A. I guess so.  .  .  . Q. There was light in it, wasn't there? A white substance in it where the hole had been cut out in the pavement? A. I don't believe so. Q. You don't believe so? But you could see it very plainly from where you were standing on the platform of the street car? A. It was just about the same color as the pavement; it wasn't very noticeable. Q. But you could see it? A. Yes, sir. Q. There were several other people got off of the car at the same time? A. Just we three. Q. Anybody else? A. No."

The evidence further shows that plaintiff had taken a route down town the morning of her injury different than was her custom; that she had not been over the place before and knew nothing of the existence of the hole. She was wearing a heavy coat, had a pocketbook in her hand and was wearing glasses with bifocal lenses. There is no evidence that plaintiff could not see with the aid of her glasses as well as any ordinary person. The hole in the pavement was on the west side of the car and, as the sun was coming up from the east, it is reasonable to suppose that at the time in question the car caused something of a shadow to be cast into the hole, although there is no testimony to this effect.

While the hole was filled up to some extent between the time plaintiff fell and the time of the taking of the photograph, the evidence shows that in all other respects the photograph is a true re-production of the situation present. The photograph indicates that there was no

abrupt break in the surface of the street where the hole, on its various sides, started, but rather shows that the edges of the asphalt had been worn unevenly and there was a gradual decline in the surface of the street toward and into the depression. The bottom of the depression itself was smooth. It extended from the car step outward or toward the west. The entire hole must have been visible to a passenger alighting from the car were she making a close inspection of the place. However, the photograph indicates that the east edge of the hole must have been immediately below the outer edge of the step and for that reason it was more or less difficult to be seen by one alighting from the car. While Miss McDowell said that the hole was easily discernible from the car, she had been over it and knew it was there and naturally she could see it with more ease than one unacquainted with it. Miss Raney saw it after plaintiff fell into it.

It is not easy to understand what plaintiff meant when she testified as follows:

"Q. If you had looked at it (the hole) you would have been able to see it, wouldn't you? A. Well, I don't know how I would look at it unless I would go over that way, and I didn't do that. It seems to me it was right as I stepped off there (indicating).

"Q. You were standing above it in the car vestibule, weren't you? A. Yes."

Plaintiff contends in her brief that this testimony shows that she would have been required to lean over in order to have seen where her foot came in contact with the edge of the hole. This is denied by the street car company. However, that may be, as before stated, the photograph, together with the fact that the overhang of the car was from eighteen to twenty inches, suggests that the east edge of the hole was so near under the car step as not to be readily discernible to one alighting from the car.

It seems to be admitted by all parties that, if plaintiff neglected to look where she was stepping on the street, she was guilty of contributory negligence, as a matter of law. Therefore, the only matter for our consideration is whether or not, as a matter of law, it must be said, because she stated that she did not see the hole, she either did not look (although she said she did) or did not look in as careful a manner as a person should have looked under the circumstances. If to look was to see, then plaintiff cannot say that she did not see. But looking at a hole in a street from a street car is entirely different from looking at a large object above the ground, such as a railroad train or locomotive. In considering this matter we think it is important to determine how closely plaintiff was required to look under the circumstances. There is no doubt that had plaintiff looked very closely it would have been possible for her to have

discovered the defect in the .street. In this connection the street car company argues, in effect, that the duty upon plaintiff to discover the hole was as great as that upon defendant and its servant operating the car. Of course, there is no merit in this contention. In a similar case the Supreme Court of Alabama stated:

"The defendant's servants were charged with the duty of knowing whether the place was reasonably safe, and, if its unsafe condition could have been discovered by them by the exercise of that degree of care required (here the highest degree of care) they must be charged with the knowledge of that condition. No such duty was imposed upon plaintiff, and she could not be held to be guilty of negligence as a matter of law, unless the place where she alighted was obviously dangerous." [Mobile Light & R. R. Co. v. Walch, C, 146 Ala. 295, 308.]

"It has already been shown that plaintiff did not fully realize the length of the step she had to take, or know precisely what sort of ground she would step on. While she said the distance was three or four feet, other witnesses said it was only about twenty-two inches. To hold that she was negligent as a matter of law in getting off there, would be to lose sight of the high care the carmen were bound to take of her. She really got off where she did at their invitation. The car was so constructed that passengers could alight from it at either side by stepping on the running board and from it to the ground; that it was expected that they would alight in that manner. Stopping, calling out the station and watching as she moved to leave the car, all of which acts the conductor did, certainly amounted to an invitation to her to leave it where it stood. [Talbot v. Railroad; Leslie v. Railroad, supra; McGee v. Railroad, 92 Mo. 208; Railroad v. Painter, 53 Kansas, 414; McDermott v. Railroad, 82 Wisc. 246; Pa. Ry. Co. v. White, 88 Pa. St. 327; Roberson v. Railroad, L. R. 2 Q. B. Div. 85; Poole v. Ry. Co., 100 Mich. 379; Bass v. Ry. Co., 70 N. H. 170.] She is not to be charged with negligence in relying on the judgment of the carmen and acting on their invitation, unless the danger of alighting at the spot was so extreme and apparent as to deter a person of ordinary prudence." [Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 589, 590.]

Negligence cannot be imputed to a passenger because she does not anticipate culpable negligence on the part of the carrier. [Franklin v. Rd., 85 Cal. 63, 70.] In the case at bar, the stopping of the street car by the street car company and its servant was a strong invitation to the passengers thereon, including plaintiff, to alight at the place and constituted an assurance of the safety of the alighting place. [Fillingham v. St. Louis Transit Co., supra; Cartwright v. Chi. & G. T. Ry. Co., 52 Mich. 606, 609, 610; McGovern v. Ry. Co., 136 Ia.

13; Topp v. United Rys. Co., 99 Md. 630, 641, 642, 643; Bullock v. Butler Exch. Co., 22 R. I. 105; Henry v. Grant St. Elec. Ry. Co., 24 Wash. 246; 10 C. J., pp. 925, 926.]

It has been stated in sidewalk cases that a pedestrian is not a sidewalk inspector and is not required to walk along with his eyes glued upon the walk in front of him and that the pedestrian is justified in assuming that the sidewalk is reasonably safe. [Callahan v. K. C., 41 S. W. (2d) 894, 897, and cases cited therein.] We think that, if anything, a passenger, in alighting cases has more reason to rely upon the safety of the street at the landing place than pedestrians in the safety of sidewalks in sidewalk cases. Therefore, it was not the duty of plaintiff to observe the place where she was stepping with a great degree of care. She was justified in relying upon the implied insurance of the street car company that the landing place was safe and, while, perhaps, she would not be excused from not looking at all, she was not required to make a close inspection of the place.

There is no claim that plaintiff could have seen the hole prior to the time the vestibule doors were opened. There was evidence tending to show that the depression in question was the same general color as the surrounding paved part of the street, ''it was just about the same color as the pavement, it wasn't very noticeable.'' There was no abruptness at the place where the hole joined the asphalt pavement. The bottom of the hole was smooth. The jury could have construed the testimony of plaintiff's witnesses, McDowell and Raney, as meaning that the defect was visible to one who was looking for it. While the question of contributory negligence, as a matter of law, is a close one in this case, we think, under all of the circumstances, that it was one for the jury.

We have examined the cases of Wheat v. St. Louis, 179 Mo. 527; Sloan v. Am. Press, 37 S. W. (2d) 884; Welch v. McGowan, 262 Mo. 709; Waldmann v. Constr. Co., 289 Mo. 622, and like cases cited by the defendants, and find them not in point. The question of contributory negligence is governed by the peculiar facts in each case. The cases cited by defendants involve sidewalk injuries and, of course, the facts in such cases are entirely different from those in the case at bar.

The street car company cites cases involving the simple tool doctrine. Of course, they have no application to cases of this kind, not only on account of the difference in the facts in such cases and cases like the one under consideration; but on account of the application of different rules of law.

We will now take up the assignments of error made by the defendant, Kansas City (hereinafter called the city).

It is insisted by the city that plaintiff was guilty of contributory negligence, as a matter of law, but as we have already covered this point it is unnecessary to go into the matter further.

However, the contention of the city that there is no proof of the giving of the notice to it as required by section 7493, Revised Statutes 1929, is well taken. There is no claim that the usual notice was served upon the city, but plaintiff relies upon the serving of the original petition in this case upon the mayor, which was served within the time required by the statute. However, there is nothing in the record to show what is contained in the original petition. The petition does not appear in the bill of exceptions so we are, therefore, unable to ascertain whether or not it complies with the statute as containing the required notice thereby. Plaintiff attempts to bring the matter before us by printing a certified copy of the original petition but, of course, it, not having been made a part of the bill of exceptions, cannot be considered by us. [Forrester v. Sullivan, 231 Mo. 345; Pavlo v. Forum Lunch Co., 19 S. W. (2d) 510, 512.]

While, as contended by plaintiff, we must indulge in the presumption of the regularity of the proceedings in the court below, the burden was upon plaintiff to show the service of the proper notice upon the city as required by the statute and the failure of the bill of exceptions to so show must be treated in the same light as failure to show any other matter that is required of plaintiff in order to make out a cause of action against the city. [Reed v. Kansas City, 19 S. W. (2d) 1047.] The presumption is that the bill of exceptions contains all the testimony.

As the case will no doubt be retried, it is necessary to pass upon other matters raised by the city, which are likely to come up at the next trial.

It would be well for plaintiff to amend her instruction No. 1, so as to strike out that part which, in effect, characterizes the action of the defendants as an effort to "shirk" or "shift" their obligations to the Gas Company. We find nothing in the testimony authorizing the court to intimate to the jury that the city was guilty of misconduct in this matter.

It would be advisable to amend plaintiff's instruction No. 2, so as to tell the jury what care is cast upon the city in maintaining its streets and so as to require the finding of a causal connection between the negligence of the city and plaintiff's injury. [See Horan v. City of Independence, 176 S. W. 1061, 1062.]

The judgment is reversed and the cause remanded for a new trial as to the defendant, Kansas City, both as to liability and as to the amount of damages, and for a new trial as to the defendant, Kansas City Public Service Company, on the amount of damages, only. The

verdict as to such defendant's liability to stand in force, and final judgment to be then entered disposing of the case as to all parties. [Neal v. Curtis Mfg. Co., 41 S. W. (2d) 543, 559; Elec. Chlorine Co. v. Wallace & Tiernan Co., 41 S. W. (2d) 1049.] All concur.