MARY B. WILLIAMSON, Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant, No. 42832—252 S.W. (2d) 295.

Division One, October 13, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, November 10, 1952.

*Mattingly, Boas & Richards* and *Lloyd E. Boas* for appellant.

*Rene J. Lusser* for respondent.

DALTON, J.—Action for damages for personal injuries alleged to have been sustained on account of defendant's negligent failure to provide plaintiff a reasonably safe place in which to alight from one of defendant's busses at the northwest corner of the intersection of Kingshighway and Lindell boulevard in the city of St. Louis. Verdict and judgment [297] were for plaintiff for $10,000 and defendant has appealed.

On April 2, 1949, at about 11 a.m., plaintiff was a fare-paying passenger on one of defendant's southbound busses on Kingshighway in the city of St. Louis. She intended to alight at Lindell boulevard in said city. After the bus stopped to discharge passengers at that place, plaintiff proceeded to alight from the front entrance door and, as she stepped down to the street with her right foot, she sustained three fractures in her right ankle. She went down into a half sitting position and the bus driver came out and placed her on the step of the bus. She remained there until the police arrived and took her to Barnes hospital.

Appellant first contends that the court erred in overruling defendant's motion for a directed verdict. Appellant says (1) that there was no substantial evidence that there was a dangerous defect in the street at the point where plaintiff fell, or that she stepped into the defect and was thereby caused to fall; and (2) that plaintiff was guilty of contributory negligence as a matter of law. We must review the evidence in a light most favorable to the plaintiff and we will disregard the defendant's evidence unless it tends to aid the plaintiff's

case. Hollister v. A. S. Aloe Co., 348 Mo. 1055, 156 S.W. (2d) 606; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W. (2d) 601, 604.

When the bus came to a stop, plaintiff undertook to leave by the front door. When the door opened, plaintiff was confronted by a crowd of ten or more children, who were in the immediate vicinity waiting to get on the bus. The children were congregated around the front entrance, all around from the left clear over to the right. They were in the street between the curb and the edge of the step. There were two steps on the bus and, as plaintiff stepped down these steps, one of the children started coming up and into the bus and plaintiff turned to the southwest, toward the front of the bus and stepped out. When asked whether she looked to see where she was stepping before she stepped down from the bus, she said: "I tried to see * * * I could not see on account of the children * * *." When asked if she looked to see where the bottom step of the bus was with reference to the curbing, she said: "I looked but the children barred my view. * * * I couldn't see the curb; I couldn't tell the distance at the time."

When plaintiff stepped into the street with her right foot, her heel hit an elevated place or ridge and her foot seemed to twist or turn and went down into a depression five or six inches deep. It "was down just reasonably within a step as you step down." She could feel the elevation, a ridge, when her heel struck and she knew it wasn't anything smooth. It was something rough. She never at any time hit the curb. The curb was at least two feet from the bottom step. After she was seated on the bus step, she observed the hole immediately below the step and a rolled up place, "a rolled ridge with a crumbly appearance. * * * It looked quite broken." The ridge was rolled up from the hole. The high point or apex of the ridge extended out six or seven inches from the curb.

Plaintiff's witness Cutrell testified that the bus stopped with the bottom step about three feet from the west curb of Kingshighway. In describing the condition of the street from the curb to the bus step, he said there were "two big ripples * * * deep ripples there at the curb"; that these "ripples" or depressions extended out to the bus; that the depression nearest the bus was about 5 inches deep; that the pavement was not broken, but there was a depressed or sunken place in the street; that "both 'riffles' came together right at a peak"; that "the top of the macadam where it came up to the 'riffle' was all loose there"; and that he "observed * * * where the lady's foot mark was there, or heel mark * * * where she had stepped and tore it down."

Defendant's witness, Tiffany, a police officer, who came to the scene of plaintiff's injury, testified that the step of the bus was about two feet out into the street from the west curb of Kingshighway; and that

"the street was more or less rough; it looked like it had been beat up from automobiles [298] going over it, the black top or asphalt pushed up."

Defendant's bus operator, O'Neal, a witness for defendant, testified that he examined the pavement on Kingshighway between the bus step and the curb. It looked just like any other place along the curb, just ordinary asphalt on the street, he would not say it was perfectly level, the busses wear the street out and there is a sort of guttering effect, but the pavement was smooth. He also testified that, as he pulled up to stop when plaintiff was injured, he knew there was a rut and depression there, a worn out place in the street; he didn't know how long it had been there, but he said he stopped with the depression right under the bus step and there was a slight rise between the step and the curb, where the macadam was pushed up toward the curb. He admitted that he had previously testified (by deposition) to the effect that there was "a kind of gutter, a ditch like" at the place where the bus stopped; that he didn't know how deep it was, but it was away from the curb. He said "the street just rolls up against it like that, the tar gets hot and rolls up"; and that the bottom of the depression was usually eighteen or twenty inches away from the curb.

Appellant argues that "plaintiff's attempt to describe the condition of the street is absolutely unintelligible"; that one of plaintiff's witnesses testified that someone took pictures of the bus before it was moved; that the pictures taken and identified by defendant's witness, Palfrey, accurately reflect the position of the bus and the condition of the street; that these pictures *conclusively* show there were no defects in the street at the point where the bus was stopped; that plaintiff admitted signing a statement within three days after her injury, saying that she stepped for the curb and missed the curb and her right ankle turned under her; that in this statement there is no mention of any defective condition of the street; that there is no substantial evidence that there was a defective condition in the street which caused plaintiff to fall; that "there is no substantial evidence as to what caused plaintiff to fall"; and that "the evidence in this case leaves the question as to how or what caused her to fall to pure speculation, guesswork and surmise."

On the record presented the matter of conflict or variance between plaintiff's testimony at the trial and her prior statements was for the jury upon the issue of credibility, weight and value of her testimony. Plaintiff was in no way concluded by the pictures mentioned. She at no time admitted that these pictures were taken at the particular time and place or that they correctly showed the condition of the street, or the location of the bus. Defendant's witness testified that he took the pictures. He gave the time and place when and where the particular pictures were taken and the kind of lens used. He testi-

fied that the three pictures in question fairly represented, in the various views taken, the relative position of the bus with respect to the curb and the appearance of the physical features of that area. Independent of his, or similar testimony, the pictures were inadmissible. In this case they were clearly sponsored by the testimony of defendant's witness, whose testimony they served to explain and illustrate. Their credibility, weight and value did not exceed that of the sponsoring witness and neither the witness' testimony nor the pictures were conclusive on plaintiff; Baustian v. Young, 152 Mo. 317, 322, 53 S.W. 921; Kirkpatrick v. Metropolitan St. Ry. Co., 211 Mo. 68, 82, 109 S.W. 682; Morgan v. Kroger Groc. & Baking Co., 348 Mo. 542, 154 S.W. (2d) 44, 51; Fitzgerald v. Schaefer (Mo. App.), 216 S.W. (2d) 939, 942; Bretall v. Mo. Pac. R. Co. (Mo. App.), 239 S.W. 597, 599; Davidson v. St. L. & S. F. R. Co., 164 Mo. App. 701, 713, 148 S.W. 406; 32 C.J.S. 611, Evidence, Sec. 709.

The favorable evidence heretofore reviewed with reference to the condition of the street at the place where the bus stopped for the discharge of passengers was entirely sufficient to sustain a finding, as submitted, "that the defendant did fail to exercise the highest degree of care and was negligent in failing to select a reasonably safe place for plaintiff to alight from said bus, and that plaintiff was injured as a direct and [299] proximate result of the aforesaid negligence of the defendant * * *." Beahan v. St. Louis Public Service Co., 361 Mo. 807, 237 S.W. (2d) 105; Beahan v. St. Louis Public Service Co. (Mo. App.), 213 S.W. (2d) 253; Wilson v. Kansas City Public Service Co. (Mo. App.), 238 S.W. (2d) 73, 76; Caley v. Kansas City Public Service Co., 226 Mo. App. 934, 48 S.W. (2d) 25, 26.

Appellant further insists that "on plaintiff's own testimony she was guilty of contributory negligence as a matter of law." Appellant argues that plaintiff "stepped down without being able to see where she was stepping"; and that "despite her inability to see, plaintiff proceeded to step off the bus at the entrance door without waiting for the children to get out of the way and without any knowledge whatever as to the location of the curb, or the condition of the place where she was stepping." Appellant says that "plaintiff admittedly failed to look and stepped off the bus at a time when she knew she could not see"; and that "under the law of this state, she was required to exercise ordinary care for her own safety while in the act of alighting from the bus."

The record does not sustain appellant's contention that "plaintiff admittedly failed to look." Whether one is guilty of contributory negligence depends upon the particular facts and circumstances surrounding the occurrence that caused the injury. Graves v. Missouri Pac. R. Co., 342 Mo. 542, 118 S.W. (2d) 787, 791. While it

was plaintiff's duty to exercise ordinary care for her own safety in alighting from the bus, there was no evidence tending to show that she had any reason to anticipate any particular danger. The fact that the bus was brought to a stop at the particular place for the purpose of discharging passengers and receiving others was at least some assurance that the place was reasonably safe; and that she could alight in reasonable safety. As a general rule a person is not required to look for danger when there is no cause to anticipate danger. Crawford v. Kansas City Stock Yards Co., 215 Mo. 394, 114 S.W. 1057, 1062; Langan v. St. Louis I. M. & S. Ry. Co., 72 Mo. 392, 397. The presence of the children on the street and between the bus and the curb was further assurance that there was a street surface there to which plaintiff could step. She looked, but the presence of the children prevented her from seeing the location of the curb or the particular condition of the street surface where she was placing her foot. The evidence was sufficient to warrant a reasonable inference that plaintiff was in the exercise of ordinary care for her own safety in stepping from the bus to the street, even though her view of the street was obstructed. Whether or not, in the circumstances shown, she exercised ordinary care for her own safety was for the jury. See, Beahan v. St. Louis Public Service Co. (Mo. App.), 213 S.W. (2d) 253, 257. The court did not err in overruling defendant's motion for a directed verdict.

Appellant contends that "the court erred in permitting defendant's witness, Palfrey, and plaintiff to testify as to what certain exhibits did or did not show, thereby invading the province of the jury on a matter which was not a proper subject for expert testimony." Appellant says that the court "permitted plaintiff's counsel to ask and Mr. Palfrey to answer a question as to whether or not there was a ridge on the picture," Exhibit 5. Mr. Palfrey, a commercial photographer, identified certain pictures (Exhibits 4, 5, and 6), which he testified he had taken of the location where plaintiff was injured and before the bus had been moved from the location. After the pictures were admitted in evidence, on cross-examination, the witness was asked if, at the time he took the pictures, he had not observed a ridge immediately to the east of the west curb line of Kingshighway. He said that he had not. Plaintiff's counsel then asked him to look at defendant's Exhibit 5 and see "whether you don't see the ridge immediately off the curb?" Defendant's objection that "the picture speaks for itself," was overruled and the witness answered, "No." Appellant could not have been prejudiced by this question or the answer, particularly, in view of the fact that, subsequently in his argument to the jury, defendant's counsel said: "See, here is an interesting picture. This is Defendant's [300] Exhibit '5'. You see here is the step of

the bus and here is the ridge running up to and just about even with the front edge of the tire. Where the lady stepped down into, in my opinion, is very, very reasonably safe."

Appellant further says that, over the defendant's objection that it was self-serving and that the pictures speak for themselves, the court permitted plaintiff to testify "that the gait revealed in the pictures (motion pictures of plaintiff taken by defendant's witness without plaintiff's knowledge) was not her normal gait, and that the picture did not truly represent her normal gait." (Parenthesis ours). Defendant's witness testified that the pictures were taken at the rate of 16. frames per second; that they were shown to the jury at the same rate; and that said rate was "normal speed." Appellant insists that "the pictures spoke for themselves"; "that anyone could see what they showed"; and that the testimony of the witness invaded the province of the jury. As stated, plaintiff testified that, as shown, the picture did not truly represent her normal gait. This testimony did not concern the pictures, as such, or what appeared in any picture, but only the rate at which the pictures were exhibited to the jury to show motion. The evidence did not invade the province of the jury, but was contradictory of the witness' testimony as to "normal speed." The assignment is overruled.

Appellant contends that the court erred in admitting speculative and conjectural evidence, towit, the testimony of Fred C. Reynolds, M.D., as to plaintiff's need for future medical and operative treatment. Dr. Reynolds treated plaintiff on the day she was injured and for sometime thereafter. He described her injuries as three fractures in her ankle, he named the particular bones fractured and reviewed the treatment administered and results obtained. He was asked whether or not he could state with any degree of medical certainty that plaintiff was still suffering from pain. He answered: "Well, I — I can't feel the pain that she is suffering. The only thing I can say is she complains of pain. She has the swelling; she has limitation of motion of the ankle, and she has changes in the x-ray. To me that is sufficient to substantiate her complaint of pain. * * * The swelling and limitation of motion are objective symptoms, as well as the x-ray. * * * Her pain. complaints are subjective." The record then shows: "Q. (Mr. Lusser) Doctor, from what you saw in plaintiff's Exhibit 'K', and from your clinical examination of this lady, can you state whether or not she will need any further treatment or any further surgery? A. Well, I think she has a very good chance that she will have to have some further surgery in the form of fusion of the ankle. Q. Fusion of the ankle. And what do you mean by that? Mr. O'Brien: I object to that. It isn't pleaded. The Court: Overruled. Proceed, Doctor. A. The fusion of the ankle is to operate upon the ankle

joint and make two major bones of the ankle joint grow together. Q. And what will be the result of a fusion of the ankle? A. It will be stiff. Q. Assume now, Doctor, that this lady has had constant pain in the ankle ever since April 2nd, 1949, which is a little better than twenty-five months, is it reasonably certain, Doctor, that she may have continued pain in the future? A Well, I think - - Mr. O'Brien: Guesswork, I believe, your honor. I object to it. Mr. Lusser: I said reasonable certainty. This is an expert. The Court: Right. Overruled. A. I anticipate that she will continue to have pain."

Appellant argues that "on the evidence considered as a whole, there is absolutely nothing to indicate that plaintiff's condition was such that an operation was contemplated"; and that "the testimony of Dr. Reynolds to the effect that there was a good chance of need of future surgery and that he anticipated pain in the future does not constitute substantial evidence (and) [301] amounts to no more than speculation, guesswork and surmise * * *."

It will be noted that the evidence as to the probable need for future surgery came in without objection and there was no motion to strike the answer after it was given. We think it sufficiently appears from the questions and from the words used in the answers, as given, that the answers were clearly intended to be the expression of the professional opinion and judgment of the expert witness. See, Armstrong v. Croy (Mo. App.), 176 S.W. (2d) 852, 853; 32 C.J. 365, Sec. 555. Plaintiff's evidence concerning her injuries and the pain experienced to the date of the trial furnished a reasonable basis for an inference of future pain. The professional opinion of the expert witness, who had treated plaintiff, was more than a mere assurance that future pain was scientifically possible. See, Detrich v. Metropolitan Street Ry. Co., 125 Mo. App. 608, 611, 102 S.W. 1044. We think the facts in evidence furnished a sufficient factual basis so that the opinions expressed cannot be held to be speculative and conjectural. Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W. (2d) 130, 135; Oesterle v. Kroger Groc. & Baking Co., 346 Mo. 321, 141 S.W. (2d) 780, 782. Further, the admission of expert testimony is a matter left largely to the sound discretion of the trial court. Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co., 237 Mo. App. 511, 175 S.W. (2d) 930.

Appellant contends that "the court erred in refusing to permit the jury to inspect the signed statements of plaintiff and her witness, Cutrell, after having admitted the statement into evidence as defendant's exhibits one and two." (Italics ours). The assignment in the defendant's motion for a new trial is that the court erred "in admonishing the jury that when the jury inspected defendant's Exhibit 2 they were to direct their attention solely to the signatures and further admonishing the jury specifically that

they were not to read the body of the statement * * *." (Italics ours). An inspection was permitted and no error is preserved with reference to Exhibit 1. In the motion for a new trial defendant complained only of the court's admonition to the jury concerning Exhibit 2.

When plaintiff's witness Cutrell was confronted with a signed statement (Defendant's Exhibit 2) purporting to have been signed by him, he denied having given any statement or having signed the document. He denied the signatures appearing thereon and, as the statement was read to him, he denied having made each and every statement contained therein. Defendant then called a witness who identified Cutrell and the statement and the signatures, as having been made by Cutrell. A specimen signature was obtained from Cutrell while he was on the witness stand (Exhibit 3). A check payable to Cutrell and endorsed by him was offered in evidence. A handwriting expert testified that all signatures were by the same person. The content of the statement (Exhibit 2) was in material respects inconsistent with the testimony of witness Cutrell at the trial. Exhibit 2 was then offered and received in evidence together with Exhibit 3 (a piece of paper with Cutrell's courtroom signature thereon) and other exhibits. Counsel then asked permission to pass the statements to the jury. "The Court: Not the statements, no. Pass the photographs if you want to. Mr. O'Brien: Well, your Honor, I think that there is a sufficient jury question raised as to the validity of the signature, that the jury should be allowed to pass upon it. The Court: No. Mr. O'Brien: The statement is in evidence, and it has been read. The Court: I don't think it is proper to submit the statements to the jury. *You can read them to the jury.* (Italics ours). Mr. O'Brien: Are you saying that I cannot pass these signatures? The Court: I don't want them to read the whole statement. You can pass them to the jury with the understanding, gentlemen, that all you are supposed to do is to look at the signatures and the signature on the yellow paper, not to read the statement. Mr. O'Brien: I except to the ruling of the Court in not allowing the jury to read the body of the statement, * * *."

Appellant contends that "the jury had no way of knowing whether the questioned [302] statements were actually in the statement without having an opportunity to examine the statement itself"; that "the statements themselves were the best evidence of their contents and without the right to inspect those statements, the jury was deprived of the right to examine the best evidence available."

The exhibit was competent for impeachment purposes. It had in fact been read to the jury (by counsel in cross-examination). Counsel admitted, "it has been read." The court offered to let counsel re-read the exhibit to the jury. There was no dispute as to the actual

content of the exhibit. It was in fact passed to the jury for the inspection of the several signatures. Only the execution of the exhibit with knowledge of its contents was in issue. We find no cases dealing with the specific question and none are cited. The cases relate to time of inspection, rather than the right of inspection by the jury. Hofstatter v. Johnson (Mo. App.), 208 S.W. (2d) 924; Barton v. Dyer, 38 Idaho 1, 220 P. 488; 64 C.J. 117, Sec. 124. Whether or not each or any juror should, in the situation shown, have been permitted to personally read the content of the particular document was within the court's discretion. The assignment is overruled.

Appellant contends that the court erred in admitting in evidence plaintiff's Exhibit "A", a photograph showing the northwest portion of the intersection of Kingshighway and Lindell, including the bus stop in question. Appellant says there was no showing "by substantial and reliable evidence," that the conditions reflected by Exhibit "A" were the conditions "which existed at the time of the occurrence, or that the conditions shown were located at the point where the entrance door of the bus stopped and plaintiff alighted." The photograph was taken December 9, 1949 by one Hampton, who testified that his camera was facing south on Kingshighway near the northwest corner of the intersection of Kingshighway and Lindell boulevard; and that the picture, as taken, Exhibit "A", was "a fairly true and accurate representation of the condition of the street as it existed that day." Plaintiff then testified that definitely and in every respect the conditions as they existed on April 2, 1949 at the "northwest intersection" of Kingshighway and Lindell were reflected "on the picture"; and that such conditions as she observed them, as she sat on the step of the bus after her injury, were accurately and truly represented. The exhibit was then admitted over defendant's objection that "eight months elapsed", referring to the lapse of time between April 2 and December 9. Exhibit "A" was sufficiently identified and properly received in evidence. Costello v. Kansas City, 280 Mo. 576, 219 S.W. 386, 390; Home Ins. Co. of N.Y. v. Savage, 231 Mo. App. 569, 103 S.W. (2d) 900, 901; Johnson v. Kansas City (Mo. App.), 272 S.W. 703; 32 C.J.S. 620, Sec. 715; 20 Am. Jur. 611, Evidence, Sec. 731.

Appellant contends that "the conduct of the trial court toward defendant's counsel created prejudice on the part of the jury and deprived defendant of a fair trial." No specific conduct is pointed out by this assignment. In argument appellant says that "throughout the trial of this case, and *without any just or reasonable cause therefor*, the trial court repeatedly rebuked defendant's counsel in the presence of the jury" (Italics ours); that "the court's repeated and unjustifiable reprimands manifested an antagonistic feeling toward defendant's counsel"; and that "the jury could not have

avoided being influenced thereby." The record shows that the trial judge frequently during the course of the trial addressed defendant's counsel, O'Brien, somewhat as follows: "Get back; get back. Don't get up here; stay back at the counsel table, all the way back and stay there. * * * Stay back at counsel table, if you please. * * * Get back to the counsel table and stay there. * * * I showed you the rule, when you address the Court, stand back at the counsel table." Out of the hearing of the jury, defendant's counsel argued that, "by the rules of court I am allowed to be anywhere * * * in this courtroom which is consistent with the order of court * * * the lawyer should [303] be allowed to move about the courtroom as he sees fit." We infer from the record presented that counsel consistently refused to comply with the court's construction of the court rules. It further appears from the record that defendant's counsel frequently argued with the court at some length on various matters. The court at times refused to accept counsel's statement concerning his reasons for approaching the witness stand or the bench, but there is nothing in the record to indicate that the statements by the court to counsel were not fully justified by the conduct of counsel. In the absence of evidence to the contrary we must assume there was a basis in fact for the court's action and that counsel was in fact failing to comply with the court's orders. A reading of the record would indicate that the court might well have excused the jury and taken other action. There is nothing in the record to indicate that the court displayed any feeling for or against any party litigant or did more than try to enforce order and proper decorum in the court and attempt to induce counsel to comply with the court's construction of the court's rules. 64 C.J. 92, Sec. 93. The assignment is overruled.

█ Appellant finally contends that the court erred in permitting plaintiff's counsel to make a highly prejudicial and inflammatory closing argument. Defendant's motion for a new trial contains no such assignment of error. The matter specifically complained of by appellant in his printed argument in this court is in no way within the purview of any error complained of in the motion for a new trial. In his closing argument to the jury, plaintiff's counsel reviewed certain testimony concerning the permanency of plaintiff's injuries and then said: "Just imagine your wife or your mother at the age of fifty seven facing the prospect - - -." After an objection and a motion to strike, the court said: "Don't talk about their wife or their mother." No further relief was asked. The matter is not preserved for review. The assignment is overruled.

The judgment is affirmed. All concur.