Argued October 15, 1936; affirmed January 12, 1937

# MAKINO *v.* SPOKANE, PORTLAND & SEATTLE RAILWAY CO.

## RAILWAY CO.

(63 P. (2d) 1082)

In Banc.

*Fletcher Rockwood,* of Portland (Carey, Hart, Spencer & McCulloch, of Portland, on the brief), for appellant.

*Arthur M. Dibble* and *Dan J. Malarkey,* both of Portland (Malarkey, Sabin & Herbring, of Portland, on the brief), for respondent.

ROSSMAN, J. This appeal brings before us only two assignments of error: one challenges a ruling of the circuit court which denied the defendant's motion for a directed verdict, and the other is predicated upon

an order which overruled the defendant's objection to a portion of the argument of plaintiff's counsel to the jury.

■ The defendant's motion for a directed verdict was based upon a contention that the injuries which the plaintiff sustained resulted from a risk of his employment which he had assumed. The plaintiff was a section laborer in the defendant's employ, engaged in maintaining defendant's interstate railroad. His action to recover damages is controlled by the provisions of the Federal Employers' Liability Act (45 USCA 51-59) which preserves intact the defense of assumption of risk (*Northwestern Pacific Railroad Co. v. Bobo,* 290 U. S. 499 (54 S. Ct. 263, 78 L. Ed. 462) ; *Toledo St. L. & W. R. Co. v. Allen,* 276 U. S. 165 (48 S. Ct. 215, 72 L. Ed. 513) ; *Cheffings v. Hines,* 104 Or. 81 (206 P. 726) ; 39 C. J., Master and Servant, p. 689, § 892), except in instances which do not include the case before us. We shall now set forth briefly the facts which determine whether the plaintiff had assumed the risk which caused his injury.

The plaintiff was born in Japan June 1, 1901, and therefore on April 20, 1933, that being the date of his injury, was 32 years and 10 months old. He remained in Japan until he was 18 years old. Some time after coming to the United States he entered the defendant's employ, and at the time of his injury had worked for it for two and one-half years as a section and extra-gang laborer. He had not had the benefit of training, and hence was compelled to resort to common manual labor. He described his work as "fixing the track". His wages were 41 cents per hour, less what he described as "a cut of 10%" and less 75 cents per month hospital dues. His foreman described him as "a good workman". Most of his testimony was given through the medium of an

interpreter. April 20, 1933, pursuant to directions, the gang of five laborers and one foreman, of which the plaintiff was a member, went to the outlying place where the plaintiff sustained his injury for the purpose of obtaining a rail. The plaintiff had never been at this place before. The trip was made on a gasoline motor car to which was attached a push car. The rail was supported on two posts of the kind commonly used by railroads for retaining spare rails alongside of the track. The posts were 12 feet from the ends of the ties of the railroad track and were 18 feet apart. The foreman planned that the crew should carry the rail from the posts to the push car, the deck of which was two and one-half or three feet above the roadbed. The rail was 33 feet long and had been used. A new rail of that type weighed 935 pounds, and this one weighed approximately that amount. The ground between the roadbed and the rail was rough and was covered with tall vegetation. In this growth, especially near the roadbed, were large rocks partly concealed, according to the plaintiff, by "some brush sprouting and the grass growing". The plaintiff testified that he had no opportunity upon his arrival at this place to take careful note of the surroundings "because I was hurried". The evidence indicates that the east posts were on ground about a foot higher than that supporting the west posts, there being a slope from the one to the other. Likewise, as is usual, the roadbed was built up so that it was higher than the adjacent ground; hence, one walking from the posts to the roadbed was compelled to ascend the slope created by the crushed rock roadbed.

When the crew arrived at the place just described, the foreman, according to the plaintiff's testimony, said: "Load this rail on the car and take it away as soon as possible." Thereupon the foreman and two of

the laborers took positions at the east end of the rail, that is, the end that was a foot or more higher than the west end, and directed the plaintiff and the two other men to take hold of the west end of the rail. Pursuant to the foreman's directions, one of the laborers, named Ono, placed himself at the west end of the rail, the plaintiff took a position alongside of Ono, and a third laborer, named Oshita, took hold of the rail to the plaintiff's right. Obedient to the foreman, each of the five men grasped the rail with his right hand over, and his left hand under, the rail. The foreman did likewise. Then the foreman called out, "Ready, pick it up". Whereupon the six lifted the rail from the rail blocks and started for the push car. When the rail had been carried to a point near the ends of the ties the load became too heavy for the plaintiff with the result that, although he and his co-laborers exerted all of their strength, and the foreman repeatedly shouted, "Hold up rail, hold up rail", the west end of the rail gradually dropped to the ground. The plaintiff's right foot and ankle were caught under the weight of the rail, thereby producing the injuries for which damages are sought in this action. Appellant's brief, referring to the plaintiff and his testimony, describes the accident thus:

"After taking hold of the rail, the work proceeded as follows: 'Then we take it by the arms and started to walk, proceeded a few steps towards the end of the railroad ties. Then, holding the rail up this way (illustrating), I became weakened. When we reached near the push car, we have to hold it up, and somehow when we got the rail up to my breast and gradually we came pushing sideways, this way (illustrating), and there was a little bank, a stepping up to the bank, then the rail was pressing back with this heavy weight.' The rail pressed back 'towards myself.' The west end was then lower than the east end. The ground at the west

end was rocky and 'more rougher' than at the east end. 'After lifting the rail, and in walking forward towards the rails on which was the push car, it was feeling very heavy and it seemed as if I was exhausting,—my strength was exhausting; still holding the rail, and I tried to raise up in order to place the rail on the push car. Then after we raised it a little to the breast, the ground was pretty steep, and then gradually it pressed backwards against my body. I could hardly hold the rail and it was pressing against me. Then the new rail began to slide down against me and I couldn't hold it, but to the last minute I still hung onto the rail, and it dropped down.' 'When the rail dropped down on the foot, I still holding the rail.  *  *  * It dropped down gradually.' The rail came to rest on his ankle when the west end lowered to the ground. After the accident the other five members of the crew loaded the rail by moving one end at a time.''

No one had stumbled after the crew undertook to carry the rail.

The only other occasion upon which the plaintiff had assisted in the carrying of a rail occurred four or five days prior to his accident. Upon that occasion he, together with the five men above mentioned, carried a rail of the same size and kind about six feet, but, according to the evidence, the ground over which that rail was carried was flat and free from obstructions. Defendant's foreman, as its witness, described the ground at that place as ''easy to walk'' upon and said that the place was an ''exactly different place'' from the one where the accident occurred. The plaintiff swore that prior to his injury he was ignorant of the weight of a rail.

The complaint is predicated upon two charges of negligence: (a) insufficiency in size of the crew, it being alleged that the work undertaken required at least eight able-bodied men; (b) failure by the defend-

ant, through its foreman, to chose a safe manner of moving the rail, it being alleged that only one end at a time should have been moved until the rail had been advanced to the push car.

■ It is clear that in this action, which has its origin in a federal statute, we are controlled by the law of negligence as formulated and announced by the federal courts. Upon this appeal the defendant makes no contention that proof of its negligence is absent. As has already been indicated, the defense of assumption of risk is pleadable in actions of this character. Under the first of the two assignments of error the question now confronts us whether the evidence conclusively indicates that the plaintiff, before his injury, had agreed expressly or impliedly that he would assume the risk of being injured while assisting in carrying this rail. The defendant does not contend that any express agreement had been effected, but insists that an implied agreement should be drawn from the above circumstances.

Vast changes have taken place in the employer-employee relationship since *Priestley v. Fowler*, 3 Mees. & W. 1 (Murph. & H. 305, 1 Jur. 987, 19 Eng. Rul. Cas. 102), decided in the year 1837, introduced the doctrine of assumption of risk into the law of master and servant. Lord Abinger, in promulgating the rule in the decision just cited, stated:

"The servant is not bound to risk his safety in the service of his master, and may, if he thinks fit, decline any service in which he reasonably apprehends injury to himself."

This freedom to accept or reject employment was the basis of Lord Abinger's doctrine. Mr. Justice Mc-Bride, in announcing the decision of this court in *Shields*

*v. W. R. Grace & Co.*, 91 Or. 187 (179 P. 265), spoke as follows of the industrial and economic conditions which today confront the laboring man affected by the doctrine:

"While, theoretically, a laborer is a free agent, at liberty to examine and guard against danger occurring or liable to occur, in the course of his employment, and to demand requisite protection, or quit the employment or take the consequences of remaining, it is common knowledge that such a theory is to a great extent impracticable in the present busy crowded age. His freedom to select his employment is abridged by the constantly increasing numbers who must work or go hungry, and his risks are increased by the immense pressure of a tremendous commerce and the complicated methods of handling it. Under the pressure of competition for employment and the necessity of maintaining his place as a satisfactory laborer, he has little time for observing his surroundings, or taking or even demanding of his employer, those precautions for his safety which a human regard for his welfare ought to be furnished without demand.

"These and like considerations have, no doubt, had their influence with the most enlightened and progressive jurists, in declaring much less stringent rules in regard to assumption of risk, than prevailed in the earlier history of jurisprudence where competition in labor was less strenuous and the duty of protecting the laborer was less clearly recognized by the courts."

The fact that today's economic and industrial conditions do not always permit the employee to "decline any service in which he reasonably apprehends injury to himself" has caused an occasional court to speak of the defense assumption of risk as a disfavored defense, although the courts recognize that it is available in all cases fairly within the rule. See 39 C. J. Master and Servant, p. 689, § 891. And has caused other courts to restrict the application of the doctrine. In the decision

from which we have just quoted, Mr. Justice McBride stated that the doctrine has been altered until it "has been placed upon a reasonably fair basis which only applies it to those cases where the laborer is held to have assumed those hazards which he would naturally observe and realize in the course of his employment, permitting him to assume that all other risks had been reasonably provided against by his employers". Mr. Justice Butler, in announcing the decision of the United States Supreme Court in *Toledo, St. L. & W. R. Co. v. Allen,* defined in the following words the risks assumed by an employee:

"The act of Congress under which plaintiff seeks recovery took possession of the field of liability of carriers by railway for injuries sustained by their employees while engaged in interstate commerce, and superseded state laws upon that subject. Second Employers' Liability Cases, 223 U. S. 1, 55, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44. This case is governed by that act and the principles of the common law as applied in the courts of the United States. The plaintiff cannot recover in the absence of negligence on the part of the defendant. Seaboard Air Line v. Horton, 233 U. S. 492, 502, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. And, except as specified in section 4 of the act (45 USCA § 54; Comp. St. § 8660), the employee assumes the ordinary risks of his employment, and when obvious or fully known and appreciated by him, the extraordinary risks and those due to negligence of his employer and fellow employees. Boldt v. Pennsylvania R. R. Co., 245 U. S. 441, 445, 38 S. Ct. 139, 62 L. Ed. 385; Ches. & Ohio Ry. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914."

From *Seaboard Air Line v. Horton,* 233 U. S. 492 (34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475), we quote:

"Such dangers as are normally and necessarily incident to the occupation, are presumably taken into

the account, in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort. * * * But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care, with respect to providing a safe place of work, and suitable and safe appliances for the work. These the employe is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious, that an ordinarily prudent person under the circumstances, would have observed and appreciated them. * * * When the employe does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employe assumes the risk, even though it arise out of the master's breach of duty.''

■ As has already been indicated, we are bound by the doctrine of assumption of risk as interpreted and applied in the federal courts. We believe that the two above passages suffice to define the rule as there employed. From these excerpts it is apparent that the employee, by his contract of employment, assumes the risks that are ordinarily incidental to his employment. In other words, in consideration of his wages, he agrees not only to perform service, but also to release his employer from responsibility for injuries which result incidentally from the service he is rendering, and are not due to the employer's disobedience to law. These perils he assumes whether he is aware of them or not. But there are other risks which he also assumes, provided he had actual or constructive knowledge of the defect and the likelihood of injury arising therefrom and, having such knowledge, elected, without protest and without assurance from his employer, to continue in the employment.

In Labatt's Master and Servant (2d Ed.), § 1311, the writer defines in the following language the elements which determine whether the employee was chargeable with knowledge of the attendant risk:

"(1) The servant's natural and acquired capacity for obtaining knowledge. The essential matters to be considered under this head are the extent of his intelligence, as deductible from his age or other circumstances; and the extent of his technical skill and information, whether that skill and information be derived from his practical experience in the employment to which the risk was incident, or from a special education and training received in some other way.

"(2) The servant's opportunities or means of obtaining a knowledge of the material conditions which created the given risk.

"(3) The extent of the servant's duty of active inspection and inquiry with regard to the existence of such risks as that to which the injury was due."

■■ In the present instance, the plaintiff, by accepting employment with the defendant as a section laborer, assumed the ordinary risks that are incidental to piling ties and wielding pick, shovel and tapping rod. But the circumstance which caused his injury was not an incidental peril. It arose from the fact that the crew was insufficient in number to handle the rail, and that a different method for carrying the rail should have been chosen by the foreman. The risk was an extraordinary one. The problem, therefore, is whether an ordinarily prudent person assigned to a position upon the rail would know that six men could not carry it in safety, and that a different method of moving it should be selected.

It will be recalled that the plaintiff's status was that of a common laborer working in a section gang. Men who accept section gang employment have not had

technical training or special schooling. Such employment is commonly regarded as being near the bottom of our industrial scale. Such work requires principally brawn and a capacity to withstand the inclemency of all sorts of weather. The members of the gang are not expected to display initiative. Wherever the lock-step routine of wielding tapping rod, pick and shovel is departed from it is at the command of the foreman. Hence, Labatt's first test discloses but little basis for imputing to the plaintiff knowledge of the risk to which he subjected himself when he undertook to carry the rail. The second test brings a like result: the plaintiff had helped to carry a rail only once before and, upon arriving at the scene of his injury, he was too hurried by the commands of his foreman to enable him to obtain anything more than a meager knowledge of the conditions. The third test concerns the employee's "duty of active inspection and inquiry". The record does not disclose that this common laborer owed his employer any duty of inspection and inquiry. It was his duty to perform his menial tasks as he was bidden. Of course, he was expected to take note of the obvious, but we do not believe that the plaintiff, upon arriving at the place where the rail was to be loaded, owed a duty to inquire concerning the weight of the rail, the lifting power of his fellow members of the gang and the ability of the men to carry the rail to the push car and then hoist it up to its new location. Nor was he expected to inquire whether the rail should have been carried with tongs or by the alternative method mentioned in the complaint. The plaintiff could reasonably construe the directions and commands of the foreman as assurances that the work could be performed in safety. The duty to inspect and inquire was lodged in the foreman.

In the two decisions which we shall now review this court was confronted with facts and issues substantially

similar to those now before us. In *Christie v. Great Northern Railway Co.*, 142 Or. 321 (20 P. (2d) 377), the plaintiff was not a common laborer upon a section gang, but was a brakeman upon a freight train. Acting under the directions of the conductor, he was helping the latter to unload from a boxcar a pair of engine wheels weighing in excess of 400 pounds. The two wheels were fastened together by their axle. After some progress had been made, the brakeman and the conductor exchanged positions and the brakeman then lifted one wheel, depending upon the conductor to steady the other. Somehow the conductor released his grip with the result that the plaintiff was injured. In his complaint the brakeman alleged that a larger crew was necessary, and in its answer the defendant averred assumption of risk. The action was controlled by the same congressional act which controls the instant case. After the evidence had developed the above facts the defendant moved for a directed verdict which was denied, and the assignment of error, based upon the order denying the verdict, became the principal issue in this court. In sustaining the action of the circuit court, our decision, written by Mr. Justice Bean, stated:

"In the present case, while in the able brief of counsel for defendant strong argument is made that plaintiff, with the aid of the conductor, had once moved the wheels, it was practically all one act in unloading the wheels, and, more than that, the moving of the wheels the first time was under different conditions from turning them around the second time for the reason that the wheels had to be raised up onto a plate.    *    *    *

"Defendant contends that where an employee is fully aware of the necessity for additional help and yet proceeds with the work, he assumes the risk of an injury resulting from the inadequate force. It is a well-settled rule than an employee assumes the ordinary risks incident to his employment and also those extraordinary

risks arising through the negligence of the employer if he understands and appreciates them. Bevin v. O. W. R. & N. Co., 136 Or. 18, 27, 298 P. 204.

"Under the circumstances of this case, as shown by the testimony, practically without dispute, we do not think that the risk arising at the time plaintiff was injured by the letting go or letting the opposite end of the pair of wheels slip and the scant force of help in performing the act could be understood or appreciated by plaintiff, so that we can say as a matter of law that the plaintiff assumed the risk, but, under all of the circumstances, it was a question for the determination of the jury under proper instructions of the court."

In *Cave v. Brown & McCabe, Stevedores, Inc.*, 128 Or. 286 (274 P. 505), which was controlled by the same legal principles which control the instant case, the plaintiff, a longshoreman in the defendant's employ, was injured while he and another employee, under the directions of their foreman, were attempting to move some irons, called "strong back", weighing approximately 600 pounds. The plaintiff charged that the defendant had failed to supply a sufficiently large crew and had chosen an unsafe method of doing the work. The defendant invoked the doctrine of assumption of risk. In sustaining the order of the circuit court which denied defendant's motion for a directed verdict, the decision of this court stated:

"The jury were also the judges as to whether or not the danger of moving the 'strong back' by hand was so imminent and apparent as to have required the plaintiff under the circumstances to disobey the order or take upon himself the consequences of complying with it."

It seems clear from the holdings in these two decisions that the circuit court did not err when it denied the defendant's motion for a directed verdict. But the defendant argues that if these two decisions are construed in a manner that supports the circuit court's action, they are out of harmony with the interpretation

placed upon the doctrine of assumed risk by the federal courts. The defendant submits that in the Christie case the foreman was negligent in releasing his grip without warning, and that our statement that the brakeman had not assumed the risk of his employment referred to that fact. It points out that in the Cave case the employee inquired of his superior whether the work should not be done by machinery, and then argues that the foreman's negative answer constituted an assurance that the work could safely be done by hand. The defendant argues that the latter decision falls within an exception to the assumption of risk rule which holds the employer liable if he assures the employee that the work involves no risk, and it argues that the Christie decision falls within another exception which declares that an employee does not assume risks created by the unexpected negligent acts of fellow workmen. While we concede that the facts to which the defendant directs attention are present in those two decisions, we believe that its interpretation of the decisions is too restricted.

The defendant also cites a large number of decisions involving strain and over-exertion in which the court held that the employee had assumed the risk of overtaxing his strength. In all of these cases the employee either had sufficient experience in performing similar tasks to know the risk he was undertaking, or he was under no compulsion to lift or work any harder than he chose, and was free to pursue any method of handling the job he preferred. Without undertaking to cite and review all of defendant's authorities, we shall mention one of each type in order to illustrate the above differentiation. In *Cotton v. Osterberg,* 88 Mont. 383 (292 P. 908), the plaintiff and his brother entered into an agreement with the defendant whereby they were to break 400 acres of land. The agreement required the defendant to furnish ''a four bottom Sattley plow'', all neces-

sary tools, etc. The plow had four beams each of which with its lay weighed 350 to 400 pounds. It was necessary from time to time to remove the lays. Upon the occasion of his injury the plaintiff and his brother, in removing the lays, lifted the beam about six inches from the ground and inserted a block of wood under it. The defendant had suggested this method when the plaintiff had requested him to provide a jack. For six weeks the work of removing the lays was carried on in this manner, and in that period the two men lifted the beam 40 times. During the last change the plaintiff was injured through over-exertion. He was 25 years old and for many years had worked with plows, tractors and other farm machinery. In sustaining the lower court's order entering a nonsuit, the decision pointed out that the plaintiff admitted "it was pretty heavy lifting; it was about all I would want to lift, and that was so every time I lifted it". The court declared:

"Under such circumstances, it is clear that plaintiff was the best judge of his own capacity. * * * He assumed the risk of overtaxing himself."

In *McCormick v. W. L. Hutchinson Electric Co.*, 326 Mo. 380, (31 S. W. (2d) 971), the facts were that the plaintiff, who was an electrician with 15 years' experience, was injured while attempting to partially raise a large heavy spool of wire by lifting upon one end of a bar which had been inserted through the center of the spool. His purpose was to place each end of the bar upon a box so that the spool would revolve freely upon the bar as its axis. His exertion overtaxed his strength, resulting in his injury. In holding that he had assumed the risk, the court pointed out:

"He 'just proceeded to do it,' without objection or complaint and without requesting help of any kind. He knew, 'approximately,' the weight of the spool of wire before he attempted to lift it. He put an iron pipe

through the center of the spool, * * * Thus it appears that plaintiff attempted to do the work assigned to him in his own way. He went about it calmly and deliberately. He was not suddenly placed in a situation where he was compelled to exert himself to the utmost or be injured otherwise. He did not meet with any untoward happening. He was injured simply because he overexerted himself.''

Let us now revert to the facts before us. Unlike the workman injured in *Cotton v. Osterberg,* supra, and similar cases, the plaintiff's experience with the task he was performing was insufficient to warrant a conclusion that he was familiar with its perils. He had helped to carry a rail only once before and the circumstances of that earlier experience were dissimilar to the conditions present upon the occasion of his injury. Unlike the workman injured in *McCormick v. W. L. Hutchinson Electric Company,* supra, the plaintiff was not at liberty to do the work assigned to him in his own way. To the contrary, every move he made and even the time selected for it was under the direction and at the command of the defendant's foreman. Hence, these two decisions and the rules which they employed are not applicable. According to the photographs of the place where the plaintiff was injured, which were received as exhibits and are, therefore, before us, the ground over which the plaintiff and his co-laborers were required to walk while carrying the rail was covered with grass which partially concealed rocks, some of them being as large as a football. Thus the peril was partly concealed. If each of the men carried his share, each supported 156 pounds when they were carrying the rail, but the end supported by the plaintiff and the two men alongside of him was a foot or more lower than the other end. Hence, this end was somewhat heavier than the other. The jarring produced by the movement of the men

added still further to the burden, especially since they were walking among ensnarling weeds and obstructing rocks. This may have caused a shifting of the load. When the men were preparing to heave the heavy rail upward on to the push car the plaintiff's strength failed him. As he faltered the foreman cried out his commands and, although all exerted their might, the rail fell to the ground. Obviously, the task was too great for these six men, especially for the three at the lower end. We cannot say that when the crew reached this place and the foreman directed them to prepare to lift the rail, the plaintiff should have known that the six men were insufficient in number and that his safety would be imperiled. There was little time for reflection and deliberation. The plaintiff had a right to construe the commands of his foreman as a representation that if he would obey the work would progress in safety: *Cave v. Brown & McCabe, Stevedores, Inc.*, supra, and 18 R. C. L., Master and Servant, p. 701, § 185. Issues concerning assumption of risk are properly submitted to the jury where the evidence concerning the material circumstances which determine whether the employee knew of the risk are conflicting; or where the circumstances, being free from dispute, are reasonably capable of supporting an inference that the employee was unfamiliar with the risk. We believe that in this case, as in the Cave and Christie cases, an inference can properly be drawn that the plaintiff did not know that the task to which he was assigned required the lifting power of more than six men. It follows, therefore, that the first assignment of error does not possess merit.

██ The second, being the last of the two assignments of error, is based upon a ruling favorable to the plaintiff which the trial judge made during the course of the closing argument of plaintiff's counsel to the jury.

It is necessary to state briefly some incidents which preceded the challenged ruling. During the course of his opening argument to the jury, Mr. Dibble, one of plaintiff's attorneys, said concerning the doctrine of assumption of risk: "Now, it is a doctrine that used to be effective in the early days in the history of Oregon and all other States, but as you know, we progress—we become more humanitarian. And the law has also made developments, especially in this matter of master and servant, and now we find in all States of the Union, including the great State of Oregon, that we have the State Compensation Law— * * *" At this point defendant's counsel objected and Mr. Dibble pursued the subject no further. The court concluded the matter by stating: "I think I had better tell the jury that the question as to what the history of the law was has no bearing in this case. It is a question of what the law is today." Next, Mr. Rockwood, one of the attorneys for the defendant, in his argument to the jury, stated his understanding of the principles of law which constitute the doctrine of assumption of risk, and concluded this portion of his discourse with the following: "That is the law as adopted by the Congress, as construed by the Supreme Court of the United States. The assumption of risk is a defense; and if the law is to be otherwise, it is up to Congress to change it. It is not up to me or the learned Court or my learned opponents here, or to you, to change the law. * * * I suggest it is not a harsh doctrine * * *." Then Mr. Malarkey, one of the plaintiff's attorneys, in the closing argument to the jury, declared: "Now, I want to adopt the language of an eminent jurist of the State of Oregon." At this point defendant's counsel stated: "* * * I object, of course, to him reading any decision of the Supreme Court of the State of Oregon." Thereupon an argument

to the presiding judge occurred at the conclusion of which the latter ruled: "It is getting pretty close to the line, I think, but go ahead." Mr. Malarkey, prefixing his quotation with the declaration, "I adopt this as my own language, no matter who said it," then read from a sheet of paper the language of *Shields v. W. R. Grace & Co.*, supra, which we have already quoted. In the course of his instructions to the jury, the presiding judge stated: "During the trial of this case an argument was made by counsel that this assumption of risk law was not a good law. Now, it is not for the Court to say in a case of this kind that the law is good or bad, and it is not your problem to determine whether a certain law is good or bad. It is your duty—it is my duty to instruct you as to the law as we find it—and it is your duty under your oaths to follow the instructions of the Court upon that question."

Although an attorney in his argument to the jury may state the principles of law applicable to the action so far as is necessary to enable him to discuss the evidence intelligently, subject, of course, to being corrected by the presiding judge, he should not be permitted to read to the jury from law books. See the exhaustive annotation in Vol. 77 A. L. R., page 650. Justice Mc-Bride's excellent dissertation on the shortcomings of the rule of assumption of risk as formerly applied was entirely appropriate in his decision. It was a part of his analysis of the rule and indicated the manner in which the decision had been reached. In that environment the discussion could not be misunderstood, and no jury was present when the words were spoken. But discussion which is permissible in one environment is not necessarily appropriate in another. When Mr. Malarkey quoted Justice McBride's words he was addressing twelve men and women who had no concern with law

making. It was their duty to accept the law from the Court without challenging its wisdom. The quoted language when placed before them could readily have led them to believe that the doctrine of assumption of risk is unjust, and that they possessed authority to ignore it. The misleading effect was not obviated by the fact that Mr. Malarkey read from a sheet of paper rather than from the Oregon Reports, nor by the fact that he did not disclose the author. The fact remained that he was inviting the jury into a field of investigation to which it was forbidden to enter. The quotation was not germane to any legitimate function of an argument to a jury. His adoption of the words as his own did not improve the situation: *Johnson v. Culver,* 116 Ind. 278 (19 N. E. 129); *Hughes v. Chicago, St. P. M. & O. Ry. Co.,* 122 Wis. 258 (99 N. W. 897); *Griebell v. Rochester Printing Co.,* 48 N. Y. S. 505 (24 App. Div. 288). The reading of the quotation should not have been permitted.

██ Mistakes are bound to occur during the stress of a trial and, since they are, the law seldom deems them beyond the scope of correction. Trial judges possess authority to correct errors occurring from time to time and the remedies which they apply are deemed effective unless the contrary appears. In the present instance, the presiding judge, during the course of Mr. Dibble's argument, admonished the jury that the history and the development of the law was of no concern to them. Later, in the course of his instructions to the jury he told them in language that was incapable of misunderstanding that they were bound by the law as he was stating it, whether they believed it just or otherwise. He had already stated to the jury the legal principles which constitute the doctrine of assumption of risk in language which the defendant does not criticize, and

then closed this portion of his instructions by adding: "It is your duty under your oaths to follow the instructions of the Court upon that question." In denying the defendant's motion for a new trial, which was predicated in part upon the alleged error which we are now considering, the trial judge stated: "The jury was above the average in intelligence, and the Court is of the opinion that they were not unduly influenced by the remarks of counsel for plaintiff." Our Constitution provides that "the legislative assembly shall so provide that the most competent of the permanent citizens of the county shall be chosen for jurors.": Constitution of Oregon, Art. VII, § 5. We do not believe that any erroneous assumption that the jurors may have drawn from Mr. Malarkey's quotation was beyond correction, and if the jurors were of the kind required by the Constitution—and the trial judge states that they were—no reversible error remained after the instructions had admonished the jury in the language above quoted: *Arnett v. Scherer,* 142 Or. 494 (20 P. (2d) 803); *Boyd v. Portland Electric Co.,* 37 Or. 567 (62 P. 378, 52 L. R. A. 509); *Graham v. United States,* 231 U. S. 474 (34 S. Ct. 148, 58 L. Ed. 319); *Holt v. United States,* 218 U. S. 245 (31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138). This assignment of error, therefore, reveals no cause for reversal.

It follows from the above that the judgment of the circuit court is affirmed.

BEAN, C. J., and BAILEY, CAMPBELL and KELLY, JJ., concur.

RAND and BELT, JJ., did not participate in this decision.