**Daisy E. WALSH, Respondent,**

v.

**SOUTHTOWN MOTORS COMPANY and Robert J. Saari, Appellants.**

**No. 53861.**

Supreme Court of Missouri, Division No. 1.

Sept. 8, 1969.

Rehearings Denied Oct. 13, 1969.

**344**

Robert L. Shirkey, Fred Mancuso, Kansas City, for respondent.

Byron J. Beck, Ronald C. Spradley, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for defendants-appellants.

HOUSER, Commissioner.

Action by Daisy Walsh for damages for personal injuries sustained as a result of having been struck by an automobile while walking across a city street. The automobile, owned by defendant Southtown Motors Company, was being driven by defendant Robert J. Saari. A trial jury returned a verdict for plaintiff against both defendants for $30,000. Both defendants appealed.

Plaintiff submitted her case to the jury on primary negligence—excessive speed. Defendants submitted the defense of contributory negligence in failing to keep a careful lookout.

Troost Avenue in Kansas City runs north and south. It is level, straight, and has an asphalt surface in good condition. 51st Street runs east and west. At their intersection Troost is 50 feet wide; 51st is 26 feet wide. Troost is a through street, four lanes wide. Two lanes are for northbound traffic. Two lanes are for southbound traffic. A painted centerline separates the north and southbound lanes. The accident occurred on Troost just a few feet north of this intersection, after dark at 8:15 p. m. on July 12, 1966. The intersection was lighted by street lights; the streets were dry; the weather was clear; the speed limit on Troost at this point is 25 m. p. h.

Plaintiff, a 69-year-old lady, lived east of the intersection. On her way home from a shopping trip she alighted from a southbound bus at the northwest corner of the intersection. Traffic on Troost was heavy that evening. She had to wait for 10 minutes for traffic to clear before she could cross the street to go home. As she was walking east and after she had entered

the easternmost of the two northbound lanes she was struck by the northbound automobile driven by defendant Saari.

Plaintiff testified as follows: Before she stepped off the curb, after waiting 10 minutes for traffic to clear, she looked both ways, north and south. Troost is "a pretty busy street, generally." She was wearing a dark plaid dress, a navy blue straw hat and blue shoes. She had a clear vision up and down the street. Her hearing was good; her eyesight fine; there was nothing to obstruct her vision. She could see down to 52nd Street which, according to defendant Saari was a distance of "over six hundred feet." There was "not too much" traffic moving up Troost at the time. She saw no vehicles as far down as 52nd Street; no vehicles that "caused [her] any concern." She did not see any cars as she started across Troost and did not see the reflection of any headlights. She walked at an ordinary, normal speed. After she stepped off the curb she looked "one time" and then proceeded straight across the street, looking straight ahead directly to the east, and never looked to the south again. In this manner she crossed the two southbound lanes, came to the centerline of Troost, proceeded across the center of Troost and across the northbound lane nearest the centerline, and walked on into the easternmost northbound lane, and "never looked to the south at any time as [she was] walking across the street." She never did see the automobile that struck her. If she had seen it she could have stopped. She never did see any other vehicle coming north in the northbound lane nearest the centerline, and did not see the car that stopped in the intersection to let her go on across. She saw no headlights; heard no squealing of tires and had no conscious recollection of being struck. There was no reason why she could not have looked as she was crossing the street.

Defendant Saari, called as a witness by plaintiff, testified that he was traveling north in the east lane for northbound traffic, at a speed of "at least" 25–30 m. p. h.

with his car headlights on. A car driven by Mary Caldwell was proceeding ahead of him in the west lane for northbound traffic. He saw the Caldwell vehicle stop approximately in the middle of the intersection of 51st Street and Troost. At that time Saari for the first time observed plaintiff "coming around in front of" the Caldwell car, looking down at the roadway. She apparently never did look up at Saari. He "slammed on the brakes" in an "emergency manner" as hard as he could but was unable to stop before striking plaintiff. The left front of the car struck plaintiff. The right-hand tire marks ran along five feet west of the east curb of Troost.

The first thing that came to the attention of Gary Church, driver of the automobile following defendant Saari, was plaintiff, who was about at the line dividing the two northbound lanes, "stepping out from in front of the Caldwell car," "walking looking down at the road." The brake lights of Sarri's car came on; plaintiff looked up and to her right and that is when the car hit her.

Mary Caldwell, approaching the intersection at 20–25 m. p. h. heard occupants of her car yell that there was a lady in the middle of the street. The front of the Caldwell car was then at the south edge of the intersection and plaintiff was about "where the centerline of Troost would be." Mrs. Caldwell put on her brakes and stopped "almost to the north side of the intersection." Plaintiff hesitated. Just as the Caldwell car stopped plaintiff started running across the street with her head down "and never looked up." She ran in front of the Caldwell car. She was in the middle of Troost when she started running. The car to Mrs. Caldwell's right, going 20–25 m. p. h., "come around and hit her." It was so dark that one could not read a newspaper by the street lights.

Mrs. Caldwell's 15-year-old daughter said it was "a little dusky—", hard to see; not real dark and not light. She saw "a shadow. It looked like the bottom of a car.

And then this woman came in sight and I yelled at mama to stop." The front of the Caldwell car was then at the south edge of the intersection, and plaintiff was at the centerline of Troost. The brakes were applied and the car stopped. When the Caldwell car stopped plaintiff hesitated and then started running, looking straight down. She never looked up. When plaintiff went by in front of the Caldwell car she was 2 or 3 feet north of the front of the car.

Other testimony indicated that the overall length of the skid marks was 89 feet, on the basis of which the speed of the car was computed at 40.7 m. p. h.; that plaintiff, walking at an average speed of 2.5 m. p. h. or 3.6 feet per second would take 12 seconds to traverse 44 feet across Troost to the place of the impact; and that an automobile traveling at 40 m. p. h. would travel at the rate of 59 feet per second, or 708 feet in 12 seconds.

An ordinance provided that "The driver of any vehicle shall yield the right of way to any pedestrian lawfully crossing or on the roadway as hereinafter provided in this chapter, and shall at all times exercise the utmost care and caution to avoid striking a pedestrian, even though such pedestrian is not lawfully crossing or on the roadway. (b) Whenever any vehicle has been stopped to permit a pedestrian to cross the roadway, the driver of any other vehicle approaching from the rear shall not overtake and pass such stopped vehicle."

Another ordinance provided that "When traffic control signals are not in place or not in operation, the driver of a vehicle shall yield the right of way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, but no pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield. A pedestrian's right of way in a crosswalk is modified under the condition and as stated in section 58.510(b)."

■ The first question is whether plaintiff was guilty of contributory negligence as a matter of law. Appellants argue that under the ordinance a pedestrian may not suddenly leave a place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield; that plaintiff was in a position of safety, protected against northbound vehicles, until she reached the centerline of Troost[1] and continued to be safe from northbound traffic until she passed from in front of the stationary Caldwell automobile into the easternmost northbound lane; that at that moment she had a duty under the ordinance to look to the south;[2] that she could not go blindly forward without again looking to the south in reliance upon the presumption that vehicles in the easternmost lane would be driving lawfully and not at an excessive rate of speed,[3] and that having walked or run from the place of safety (shielded by the stationary Caldwell car) into the farthest lane without looking, she was guilty of contributory negligence as a matter of law.[4] Appellants further argue that plaintiff not only had a duty to look, but also had a duty to see the automobile which struck her, which was in plain view when she reached the dividing

1. Citing Morris v. Duker, Mo.Sup., 414 S.W.2d 77.

2. Citing Russell v. Bauer-Berger Grocery Co., Mo.App., 288 S.W. 985 and Dempsey v. Horton, 337 Mo. 379, 84 S.W.2d 621, 625.

3. Citing Paul v. United Rys. Co. of St. Louis, 152 Mo.App. 577, 586, 134 S.W.

3; Tietze v. New York, C. & St. L. R. Co., Mo.Sup., 250 S.W.2d 486, 488, and Timmons v. Kilpatrick, Mo.Sup., 332 S.W.2d 918, 922.

4. Citing Carpenter v. Kansas City Pub. Serv. Co., Mo.Sup., 330 S.W.2d 797.

line between the two northbound lanes; that a glance to her right would have disclosed the oncoming automobile and that it was impossible for the driver to yield and that there was not time for her to safely cross the last lane.[5] Appellants quote from Morris v. Duker, Mo.Sup., 414 S.W.2d 77, 83 [6], a pedestrian case decided under the same ordinance, in which the evidence justified a *jury finding* that plaintiff was in a place of safety, but in which we did not hold as a matter of law that the place from which plaintiff proceeded was a place of safety. Nor did we hold plaintiff guilty of contributory negligence as a matter of law, but rather that there was evidence from which "she could properly be found guilty of contributory negligence" (by the jury). Whether Daisy Walsh's position in front of the Caldwell car was a "place of safety" within the meaning of the ordinance was a question for the jury. Appellants liken this case to that of Lee v. Zumbehl, Mo.Sup., 410 S.W.2d 79, in which a pedestrian was held guilty of contributory negligence as a matter of law, but that case is not controlling. Lee clearly convicted himself of negligence. When Lee arrived at the center of the street he actually saw the approaching car, with its lights burning, 250–300 feet distant, approaching at an unestimated speed. He should have been conscious of impending danger. Nevertheless he walked 25 feet again further "without ever looking" in the direction of the approaching car. Zumbehl's car was not being driven at an excessive speed. The circumstances were such that "any reasonable and competent person would and should have anticipated danger and a probability of a collision." 410 S.W.2d, l. c. 81. The "great likelihood of a collision" which should have been apparent to Lee was not apparent to plaintiff in this case, who did not see the approaching car.

Whether it was the duty of plaintiff to look to the south at the time she reached the center of Troost and to take a third look to the south after passing across in front of the Caldwell car and before entering the last lane were questions for the jury to determine. In the exercise of ordinary care it was the duty of the plaintiff to look to the north and to the south to ascertain if she could cross the street in safety. Plaintiff looked to the south before she essayed to enter the street. She could see 600 feet and saw nothing. Considering the speed of the car that struck her, the evidence that its speed was constant, and the number of seconds that elapsed from the time she looked until she was struck, it may be mathematically demonstrated and the jury could have found that the car was more than 700 feet to the south when she looked (and therefore that it was out of her sight) and that if defendant Saari had been driving within the 25 m. p. h. speed limit plaintiff would have been able to cross the street in safety. "In considering whether plaintiff exercised proper care to discover * * * whether she could cross in safety, we must consider the situation in which plaintiff was placed, the circumstances surrounding her, and the variety of distractions which beset her." Jedlicka v. Shackelford, Mo.App., 270 S.W. 125, 128 [3]. Plaintiff had the right to assume that any cars that might appear on the scene after she looked would be operated lawfully and not at an excessive speed, and therefore conceivably could have concluded that the way was clear and that she had ample time to cross the street before any potential vehicular traffic would reach her cross path. She was not required to anticipate that some driver would disobey the traffic laws. Robinson v. Mayer, Mo. App., 94 S.W.2d 1067, 1069 [2, 3]; Jedlicka v. Shackelford, supra, 270 S.W. l. c. 127, 128 [1, 2]. That right, however, did not entitle her to abandon all care for her own safety. She was obliged to continue to exercise ordinary care, and could not blindly walk into the path of danger in total reliance upon the duty of the operators of

5. Citing Melton v. St. Louis Pub. Serv. Co., 363 Mo. 474, 251 S.W.2d 663, 667 and Timmons v. Kilpatrick, Mo.Sup., 332 S.W.2d 918, 921.

motor vehicles to exercise the highest degree of care. Whether by looking south once before leaving the curb, under the circumstances shown in evidence, plaintiff discharged her duty and obligation to exercise ordinary care for her own safety, or whether she was duty bound to look again when she reached the centerline, or again when she reached the last lane, were questions for the jury to determine, and not for the court to declare as a matter of law. Judge Cardozo stated the rule succinctly in Knapp v. Barrett, 216 N.Y. 226, 230, 110 N.E. 428: "A wayfarer is not at liberty to close his eyes in crossing a city street. His duty is to use his eyes, and thus protect himself from danger. * * * *The law does not say how often he must look,* or precisely how far, or when or from where. *If,* for example, *he looks as he starts to cross, and the way seems clear, he is not bound as a matter of law to look again.* * * * If he has used his eyes, and has miscalculated the danger, he may still be free from fault. * * * *" (Italics ours.) Plaintiff's duty to look to the south a second or third time was relative, not absolute. Romandel v. Kansas City Pub. Serv. Co., Mo.Sup., 254 S.W.2d 585, 591 [10]. "As a general rule a person is not required to look for danger when there is no cause to anticipate danger." Williamson v. St. Louis Pub. Serv. Co., 363 Mo. 508, 252 S.W.2d 295, 299 [5–8]; Farr v. Manzella, Mo.App., 362 S.W.2d 752, 755, 756 [4–9]. This case is governed by the general rule that when a pedestrian, intending to cross a street, looks both ways, sees no automobile approaching and is injured in the crossing the question whether in the exercise of ordinary care he should have continued to look to the right and left as he proceeded across the street is a question for the jury. Miller v. St. Louis Pub. Serv. Co., Mo.Sup., 389 S.W.2d 769, 773 [6, 7]; Ginter v. O'Donoghue, Mo. App., 179 S.W. 732, 734 [5, 6]; Brown v. Conser Laundry Co., Mo.Sup., 246 S.W. 166, 169 [2].

■ The second point, made by the corporate appellant, is that the evidence was insufficient as a matter of law to establish the agency of defendant Saari as an employee acting within the course and scope of his employment and under the control of defendant Southtown Motors Company at the time and place of the accident. This point is disallowed under evidence that Saari was employed at that time by Southtown Motors Company as a salesman, working on a commission basis; that as a part of the employment contract Southtown furnished Saari the automobile which struck plaintiff; that the automobile was owned by Southtown; that Southtown furnished Saari with gas, oil and maintenance; that the car was furnished to assist Saari in carrying out his duties and to enable him to call upon company customers and sell them automobiles; that prior to the accident he had been at Southtown's used car lot at 62nd and Troost; that he left the car lot and was traveling north on Troost with the intention of calling upon customers that evening; that he had a particular customer to whom he wanted to talk and that is what he was intending to do. It was on this trip that the accident occurred. Evidence of ownership of the vehicle by the corporate defendant; general employment of the driver by the corporate defendant, and that the driver was on a specific mission on behalf of the employer was sufficient to submit the question of agency to the jury. Guthrie v. Holmes, 272 Mo. 215, 198 S.W. 854.

Appellants raise ten additional points, all relating to alleged procedural errors entitling them to a new trial. One of these points relates to alleged improper argument to the jury by plaintiff's counsel. The point is meritorious, and for this reason the judgment must be reversed and the cause remanded for a new trial.

■ The argument constituted a direct attack upon the propriety of the defense of contributory negligence. Under the law of this state the contributory negligence of a plaintiff constitutes a complete bar to recovery against one charged with primary negligence. The defense of con-

tributory negligence, while harsh, and although supplanted in many other jurisdictions by the doctrine of comparative negligence, is a time-honored, fully recognized, legitimate and valid defense in this state, and as such is entitled to be respected and enforced when the facts warrant its invocation. This is a strong case for the invocation of the doctrine. Impartial and unbiased jurors hearing the evidence in this transcript could readily find plaintiff guilty of negligence in failing to keep a careful lookout and that such negligence directly caused or contributed to her injuries. This legitimate defense, supported by substantial evidence including plaintiff's admissions of inattention after she left the curb, was submitted to the jury by Instruction No. 8. Defendants had as much right to have their defense of contributory negligence fairly and freely considered by an impartial and unprejudiced jury as plaintiff had to have her submission of negligent speed so considered.

Plaintiff's counsel, over appropriate objections, was allowed by inference to brand the doctrine and defense of contributory negligence as an unmanly, dishonest, unwelcome and ignoble defense, and was permitted to directly castigate it as "the last refuge of guilty defendants" to which the jury "are not slaves"; an "unholy visitor in this courtroom"; and to state that in order to apply this defense "you have to swallow your sense of justice, you have got to blind your eyes to everything you know about the law, everything that you have been taught, and turn [plaintiff] away because of this inequitable command of our civil law"; to state that there was a man on this earth two thousand years ago "who * * * said that you should not turn a widow and an orphan from their right" and that there is no law that turns helpless cripples and widows out of court. Counsel made the plea "as the only man in her life at this time," thereby directly referring a third time to the fact that plaintiff was a widow.

■ It is improper for counsel to make an argument against the law as laid down in the court's instructions, Robbins v. Brown-Strauss Corp., 363 Mo. 1157, 257 S.W.2d 643, 648 [5]; State ex rel. Schnaider Brewing Co. v. Edwards, 35 Mo.App. 680, or to dispute, disparage or urge the jury to look with suspicion upon or disregard the court's instructions, Anno: Argument to Jury—Law or Lawbooks, 66 A.L.R.2d 9, § 9 [c], p. 51; Shurlow v. Hoadley, 186 Ill.App. 328, or to denounce the law which the court has given to the jury. Carder v. Primm, 64 Mo.App. 92, 93–94. Counsel must accept the charge to the jury, yield obedience to it and are not permitted to argue against it. Jensen v. Utah Ry. Co., 72 Utah 366, 270 P. 349. Such argument could lead the jury to believe that the law as declared by the court is unjust and that the jurors possess the authority to ignore it, and is not germane to any legitimate function of an argument to the jury. Makino v. Spokane, P. & S. Ry. Co., 155 Or. 317, 63 P.2d 1082, 1090.

■ Notwithstanding it was improper for counsel to cast aspersions on, denigrate, and castigate the defense of contributory negligence the court permitted counsel to make a stinging attack on this defense *as a defense*. The attack was intemperate and calculated to arouse the passions and distract the minds of the jurors from the legal issues before the court. The derogatory remarks were of such a nature as to cause the jury to despise and ignore the law of contributory negligence as declared by the court and to reject the defense and thus frustrate the right of defendants to a verdict if the jury considered that plaintiff failed to keep a careful lookout and was thereby negligent and that plaintiff's negligence directly caused or contributed to her injury. Jurors would have to be superhuman to remain dispassionate, impartial and unbiased after this heavy and sustained bombardment, especially in view of the fact that the court overruled repeated objections and refused to intervene, thereby in the eyes of the jury approving or at least

condoning the shelling given this legitimate defense. Merritt v. Wilkerson, Mo.App., 360 S.W.2d 283, 287. The argument, inflammatory as it was, subverted the trial and prevented it from being that calm and dispassionate inquiry into the facts to ascertain the truth under the law to which all parties have a legal right. Butcher v. O'Connor, Mo.Sup., 401 S.W.2d 490; Dunn v. Terminal R. Assoc. of St. Louis, Mo. Sup., 285 S.W.2d 701.

The argument was not proper retaliatory argument, as urged. Defendants' counsel had argued that if Robert Saari was 99% negligent and plaintiff was only 1% negligent plaintiff could not recover under the law. This was improper argument. It is not the law that defendant is entitled to a verdict if plaintiff's injury was caused *in any degree* by want of care on his part, Bobos v. Krey Packing Co., 317 Mo. 108, 296 S.W. 157, 161, [6]. Plaintiff's negligence is a contributing cause of his harm only if it is "a substantial factor" in bringing about his harm. Restatement of Torts 2d, 1966 Appendix, § 465. Counsel for plaintiff could have objected to or answered this improper argument but it did not entitle plaintiff's counsel to retaliate by indicting and blasting the law of contributory negligence as a defense.

Since the judgment must be reversed for error in the argument of plaintiff's counsel we will not take up seriatim the several other claims of procedural error. On retrial the dangers involved in these assignments of error may be avoided.

Judgment reversed and cause remanded for a new trial.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., STORCKMAN, J., and HENLEY, Alt. J., concur.

HOLMAN, J., not sitting when cause was submitted.