504 F.Supp. 746 (1980)
Michael D. WILLIAMS, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 76-209C(A).
United States District Court, E. D. Missouri, E. D.
August 6, 1980.
Gerald R. Ortbals, Clayton, Mo., John R. Musgrave, St. Louis, Mo., for plaintiff.
Bruce White, St. Louis, Mo., Donald L. Sime, U. S. Dept. of Justice, Washington, D. C., for defendant.

*747 MEMORANDUM OPINION
HARPER, District Judge.
Plaintiff brought this action against the United States of America in two counts. In Count I the plaintiff alleges that negligent acts by employees of defendant's agency, The Federal Aviation Administration (FAA), proximately caused the crash of Ozark 809 and the resulting injuries to plaintiff. In Count II the plaintiff alternatively alleges that negligent acts by employees of defendant's agency, The National Weather Service (NWS), proximately caused the crash of Ozark 809 and the resulting injuries to plaintiff.
This case arises out of the crash of Ozark 809 (Ozark 809) on June 23, 1973, near the St. Louis Lambert International Airport (hereinafter referred to as Lambert Airport). Plaintiff, the co-pilot of Ozark 809 on that day, was injured in the crash. Jurisdiction is proper pursuant to 28 U.S.C. § 1346 and the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.
Prior to bringing this action, plaintiff presented claims to the FAA and to the National Oceanic and Atmospheric Administration, NWS, seeking administrative settlements for the alleged negligence. The FAA failed to make a final disposition of plaintiff's claim within six months after it was filed, which may be deemed a final denial by the agency for the purposes of this lawsuit under 28 U.S.C. § 2675(a). Plaintiff's claim against the NWS was denied by the United States Department of Commerce, the parent organization of the National Oceanic and Atmospheric Administration, NWS.
Plaintiff alleges that FAA air traffic controllers negligently failed to forward to the crew of Ozark 809 information of significant weather phenomenon and that employees of the NWS negligently failed to issue a severe thunderstorm warning prior to 5:40 p. m. c.d.t. (all times referred to in this opinion are central daylight time). Plaintiff further alleges that when the severe thunderstorm warning was issued at 5:40 p. m. the employees of the NWS negligently failed to notify Lambert Airport control tower of the warning until 5:48 p. m., eight minutes after the warning was issued.
The pleadings, stipulations of fact, credible testimony, and exhibits disclose that on July 23, 1973, Ozark 809 departed from Nashville, Tennessee, on a regularly scheduled passenger flight to St. Louis, Missouri, with intermediate stops at Clarksville, Tennessee; Paducah, Kentucky; Cape Girardeau, Missouri; and Marion, Illinois. The airplane was a Fairchild Hiller FH-227B twin engine turbo-prop, equipped with a Bendix RDR-1E weather radar. Arvid L. Linke was the pilot in command of Ozark 809 and plaintiff was the co-pilot. Linke had been promoted to captain only a short time prior to the accident. Both plaintiff and Linke held Airline Transport Pilot Certificates, had qualified to fly the Fairchild Hiller FH-227B, and had received training in the use of airborne weather radar.
At Marion, Illinois, approximately forty-five minutes before the crash, the crew of Ozark 809 received the latest St. Louis terminal forecast calling for occasional thunderstorms with moderate rain showers. This forecast was prepared by NWS employees at Lambert Airport. Shirley Matejka, Harry Waldheuser and David Jokerst were employees of NWS on July 23, 1973, at Lambert Airport and they were acting within the scope of their employment. Matejka was working the 10:00 a. m. to 6:00 p. m. shift as the aviation forecaster. She had the responsibility for making the terminal forecast for Lambert Airport. The forecast received by the crew of Ozark 809 was one which she had issued.
At 1:45 p. m., Waldheuser, the lead forecaster, issued a severe thunderstorm warning for counties just north of St. Louis, the warning being in effect until 3:30 p. m. A severe thunderstorm is defined by the NWS as one with winds in excess of 50 knots and/or hail of ¾ inch or larger. A check by the Missouri Highway Patrol in the area covered by the warning revealed thunderstorms, but none that met the criteria for severe thunderstorms.
*748 At 3:00 p. m. Jokerst replaced Waldheuser as lead forecaster. Jokerst and Matejka placed a telephone call to the Severe Local Storm Unit of NWS in Kansas City, Missouri, and based on the information received from the phone call, data available at the St. Louis office, and the non-severe nature of the thunderstorms occurring earlier that day, decided not to issue an additional severe thunderstorm warning. At 5:40 p. m. Jokerst did issue a severe thunderstorm warning. His decision to issue a warning at that time was the result of a rapid increase in the size and intensity of the radar echoes to the southwest of St. Louis and of visual observations of the thunderstorms. Jokerst assigned Matejka the task of disseminating the warning. In accord with a check list of priorities for severe thunderstorm warnings she first handed a copy of the warning to the communicator in charge of typing it up for the teletype system, and then at 5:43 p. m. she read the warning over the weather radio station KDO-89. After her live broadcast, Matejka made a tape of the warning and put it on KDO-89 for continuous play. Her next stop was to make sure that the warning had gone on the teletype and to the police. At 5:48 p. m. she placed the severe thunderstorm warning on the telautograph. The air traffic controllers at Lambert Airport receive weather warnings from the NWS on the telautograph. There was a direct telephone line from the NWS office at Lambert Airport to the control tower, but it was not used by Matejka and was not on the checklist. The telautograph was low on the checklist for disseminating severe thunderstorm warnings because a severe thunderstorm warning is a warning to the general public, and accordingly NWS first seeks to notify the largest number of persons in the affected area.
The FAA operated an air traffic control tower at Lambert Airport on July 23, 1973. James Kaiser was assigned to the AR-2 approach control position, Larry Markley was assigned to the local control position, and Paul Wilson was assigned to the ground control position. All were employees of the FAA and were acting within the course and scope of their employment on the afternoon of July 23, 1973. The approach controller handled arriving aircraft in the vicinity of the airport, the local controller handled the final approach of the aircraft, and the ground controller directed the aircraft after they had landed. As air traffic controllers their first priority was to insure separation of aircraft. A secondary priority was to relay pilot-reported significant weather information to aircraft concerned. The terminal air traffic control manual states that significant weather information includes pilot reports concerning areas of strong frontal activity, squall lines, heavy thunderstorms, widespread fog, moderate to heavy icing, turbulence (including clear air turbulence) of moderate or greater intensity or similar air conditions pertinent to safety of flight.
On July 23, 1973, between 5:25 p. m. and 5:30 p. m., three flights, King Air 2400, TWA 244 and Ozark 809, contacted St. Louis approach control in their approach for landings at Lambert Airport. All three were assigned to Runway 30-left, but their flight paths differed until approximately three miles from the runway.
The King Air 2400 was sequenced to land before the other two aircraft. In its final approach, the King Air 2400 first experienced difficulty in descending because of an updraft, then it hit a downdraft that carried the plane down at a rapid rate. The King Air 2400 was able to break out of the downdraft and land. Chester O. Smith, Jr., pilot of the King Air, reported to the ground controller that approach control ran him through the "heaviest stuff" he had ever been through and that he could not get the plane out of 6,000 feet. When asked by the ground controller to repeat the message, Smith did so without clarifying what he meant by "heaviest stuff." Wilson, the ground controller, responded that he would forward the information, but did not do so. The crew of Ozark 809 was not advised of Smith's report and would not have heard his report because they were using a different radio frequency.
TWA 244 was sequenced to land second. At approximately seven miles from the runway, *749 the captain of TWA 244, Roy Gwin, reported to approach control that "I wouldn't send anybody behind us through this. We're in hail and everything else right here in this spot." A short time later Captain Gwin stated that "It's rougher than everything." Approach control did not pass Captain Gwin's assessments on to Ozark 809, but Ozark 809 was on the same frequency and the crew was listening to Captain Gwin's transmissions. At 5:40:53 p. m. Captain Gwin advised the local controller that he was executing a missed approach. The missed approach was caused by an inability to reduce the speed of the aircraft sufficiently in order to lower the flaps for landing. Captain Gwin did not inform the local controller of the reason for his missed approach. Local Control did not advise Ozark 809 of the missed approach by TWA 244. The crew of Ozark 809 was tuned in on the same frequency as TWA 244 but it is unclear whether or not they actually heard the missed approach call.
Ozark 809 was third in the landing sequence. Captain Linke had only partial recall of the events leading up to the crash. Plaintiff had no recollection of the events that afternoon. Ozark 809's cockpit voice recorder was recovered from the wreckage, but there were fadeouts on the tape in the two to three minutes preceding the crash.
Captain Linke spotted thunderstorms south of St. Louis and he recalled seeing a green band of clouds parallel to the approach path. The plaintiff and Captain Linke were aware of the rough weather. The cockpit microphone recorded them making such comments as "Think it's a bad one," and "Rougher than hell." The last radio contact with Ozark 809 was at 5:42:35 p. m. when local control advised Ozark 809 that "It looks like a heavy rain shower moving right across the approach end of the runway now." Plaintiff replied, "Ah, roger, we see it."
Richard Carney, a pilot with approximately 3800 hours flying time, was driving to the south of Lambert Airport at around 5:40 p. m. when the trunk of his car popped open. He stopped his car, and after closing the trunk, glanced up and saw Ozark 809. The plane was making its final approach when it suddenly rose several hundred feet in the air and then abruptly plunged to within 150 to 200 feet of the ground. These events occurred without a change in the attitude (angle of inclination) of the aircraft and occurred not underneath the thunderstorm cells where strong updrafts and downdrafts are common, but in clear air. About the time that the pilot of Ozark 809 appeared to regain control, the left wing was struck by lightning. The left wing dropped excessively which brought the plane closer to the ground. The pilot appeared to again regain control of the airplane but it was extremely close to the ground, in a valley. Ozark 809, unable to clear a ridge line, struck several trees and then struck the ground at approximately 5:44 p. m.
Plaintiff sustained a broken jaw, broken facial bones, and various cuts and bruises. He also missed over eight months of work. Upon returning to work plaintiff was initially unable to secure a first-class medical certification necessary for him to return to commercial flying. He worked as an assistant dispatcher until September 15, 1975, when he received first-class medical certification. Plaintiff was at the time of trial employed as a pilot by Ozark Airlines.
Plaintiff contends that the approach controller and local controller were negligent for not reporting information of significant weather phenomenon to the crew of Ozark 809, and that the ground controller was negligent in not forwarding the King Air 2400 report to the approach controller. The severe thunderstorm warning issued by the NWS at 5:40 p. m. was not received in the control tower until approximately four minutes after Ozark 809 had crashed, too late to have helped the crew of Ozark 809. The reports of severe weather by the captain of TWA 244 were not relevant to Ozark 809 as they concerned an area not traversed by Ozark 809. The missed approach executed by TWA 244 was relevant to the flight path of Ozark 809, but the captain of TWA 244 did not at that *750 time give the reasons for executing a missed approach. With respect to the significance of the mere fact that TWA 244 did execute a missed approach, the crew of Ozark 809 was, or should have been, aware of it since the missed approach call was made over the same radio frequency that Ozark 809 was on. The King Air 2400 report could have been very significant since King Air 2400 had experienced a strong updraft and then a strong downdraft during its final approach. However, the pilot of King Air 2400 was very vague in his communication, complaining of the "roughest stuff" he had ever seen. He did not report what he meant by "roughest stuff," nor did he indicate at what point he had encountered it. In view of the vagueness of the pilot's report the Court cannot say that the ground controller was negligent in not forwarding the report to the local controller, especially since the ground controller asked for and received the report a second time without the information becoming any clearer. The local controller did inform the crew of Ozark 809 of a heavy rain shower moving across the approach end of the runway, to which plaintiff replied, "Ah, roger, we see it." The air traffic controllers had no more knowledge of the severe updraft and downdraft that Ozark 809 encountered than plaintiff. The Court concludes that the FAA employees at Lambert Airport were not negligent with respect to their actions toward plaintiff and Ozark 809.
Plaintiff contends that employees of NWS were negligent for failing to issue timely severe thunderstorm warnings and for failing to utilize available telephone systems to expeditiously dispatch information of the severe thunderstorm warning to the air traffic controllers.
Predicting the weather is not an exact science. The forecasts or omission of forecasts is a discretionary function excepted from the Federal Tort Claims Act by 28 U.S.C. § 2680(a), National Mfg. Co. v. United States, 210 F.2d 263, 278 (8th Cir. 1954). Even were liability for forecasts not excluded by § 2680(a), the NWS employees were not negligent in waiting until 5:40 p. m. to issue a severe thunderstorm warning. The evidence establishes that they continuously monitored the weather conditions and that the lead forecaster issued the warning when he decided that conditions were such that a severe thunderstorm was likely.
Eight minutes passed before the air traffic controllers were notified of the severe thunderstorm warning. A severe storm warning is a warning to the general public and so it was dissiminated by methods designed to notify the greatest number of people. Also, airplane pilots are trained to make their own evaluation of weather conditions and so are in a much better position than the general public to recognize severe weather and take the proper precautions. The Court concludes that there was no negligence or delay by NWS employees in disseminating the severe thunderstorm warning.
In Missouri contributory negligence on the part of a plaintiff is a complete bar to recovery against one charged with primary negligence. Walsh v. Southtown Motors Co., 445 S.W.2d 342, 348 (Mo. 1969). The crew of Ozark 809 was aware that the weather conditions were not good. They heard, or should have heard TWA 244's missed approach call, and plaintiff acknowledged seeing a heavy rain over the approach end of Runway 30-left. Plaintiff had been trained in evaluating the weather and had at his disposal a weather radar. The Court concludes that the pilot's decision to land in the face of the information available to him was clearly negligent and that the plaintiff was also negligent, since, as co-pilot, it was his duty to bring to the pilot's attention any hazardous conditions. There is nothing in the record to indicate that plaintiff questioned the pilot's decision to land or offered any advice on the weather conditions.
The Court concludes that there was no negligent acts by employees of the FAA or employees of NWS in respect to the plaintiff, and that forecasts or omission of forecasts is excepted from the Federal Tort Claims Act. The Court further concludes that plaintiff was contributorily negligent.
*751 Accordingly, it is ordered that judgment be entered for defendant, United States of America, and against plaintiff, Michael D. Williams, on both Counts I and II.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law and the clerk of the Court will prepare and enter the proper order.